T.C. Memo. 1998-17


UNITED STATES TAX COURT


GEORGE AND BOZENNA POHOSKI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9027-96.                    Filed January 13, 1998.


<u>Philip Garrett Panitz</u>, for petitioners.

<u>Donna F. Herbert</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  Respondent determined a $28,143 deficiency in petitioners' 1993 Federal income tax, and an accuracy-related penalty of $2,662 pursuant to section 6662(a).

After concessions, we must decide: (1) Whether petitioners materially participated in the rental of their two Hawaiian condominiums for purposes of the passive activity loss rules

pursuant to section 469(a); and (2) whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).

All section references are to the Internal Revenue Code as in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, George and Bozenna Pohoski, husband and wife, resided in Camarillo, California.

Background

During 1993, Mr. Pohoski was employed as an engineer with the U.S. Department of Defense, and Mrs. Pohoski was employed as a nurse. Both petitioners worked an average of 40 hours per week. Petitioners have two children.

Throughout the year in issue, petitioners owned two condominiums in Camarillo, California (the Camarillo condominiums), and two condominiums in Hawaii. The Camarillo condominiums were generally rented out on a long-term lease basis. Petitioners managed the Camarillo condominium properties themselves, collecting the rents, making repairs, and maintaining the books and records. Respondent concedes that the rental of the Camarillo condominiums was properly reported by petitioners on their 1993 joint Federal income tax return.

## 1. Hawaiian Condominiums

In 1991, petitioners purchased a condominium at the Valley Isle Resort on the island of Maui, Hawaii (the Maui condo). In 1992, petitioners purchased a condominium at the Wavecrest Resort on the island of Molokai, Hawaii (the Molokai condo). Both of these condominiums were purchased as rentals to vacationers. Each condominium included one bedroom, one bathroom, a living room, kitchen, dining room, and lanai.[1]

### A. Maui Condo

As owners of the Maui condo, petitioners were members of the Homeowners' Association at the Valley Isle Resort (Homeowners' Association). The Homeowners' Association entered into a contract with Rainbow Reservations, Inc. (Rainbow Reservations) to operate the front desk for the Valley Isle Resort condominiums. Rainbow Reservations also provided management services for individual condominium owners. During 1993, Rainbow Reservations entered into management contracts with owners of approximately 40 of the 120 condominium units at the Valley Isle Resort.

Generally, Rainbow Reservations provided a variety of services for the condominium owners with whom they had management contracts, including the rental of the condominium units, collection of rents, after-hours front desk services, maid services, repair and maintenance services, and redecorating services. Rainbow

---

[1]     A lanai is a Hawaiian term for a porch or veranda.

Reservations also provided biennial "deep cleans" of each condominium. For these services, Rainbow Reservations charged a commission of 40 percent of the gross rents.

As part of its front desk service contract with the Homeowners' Association, Rainbow Reservations checked guests in and out of the condominiums, issued parking permits, answered questions regarding entertainment or other activities in the area, and provided additional services as needed. During 1993, the front desk's normal business hours were between 8 a.m. and 5 p.m., although the front desk stayed open longer between July and early October for a sprinkler refit at the resort. The front desk staff consisted of two to four persons at any one time.

Rainbow Reservations provided its own advertising for all of the units it managed in Hawaii, including Valley Isle Resort. In general, the advertisements were directed toward travel agents, although some were directed toward the public.

Petitioners did not enter into the typical management contract with Rainbow Reservations. Instead, petitioners and Rainbow Reservations agreed that petitioners would rent the Maui condo themselves and perform the majority of services otherwise provided by Rainbow Reservations. Petitioners and Rainbow Reservations entered into an "Amendment to Rental Agreement Between Owner And Rainbow Reservations, Inc." (the addendum agreement) which provided:

Effective * * * November 1, 1992 owner will be responsible for renting unit directly. In the event Rainbow Reservations wishes to rent unit to one of its clients, Rainbow Reservations will contact owner and clear the time before committing the unit. Owner will control the MASTER CALENDAR.

Rainbow Reservations agrees to coordinate the maid service, and maid company will bill the owner directly unless agreed otherwise. Owner(s) agrees to notify Rainbow Reservations of his guest arrivals and pay all costs associated. Rainbow Reservations will continue to provide front desk counter service for all owner's guests, which will include, greeting of guests, key distribution (unless agreed to otherwise), coordination of maid service, and collection of any due rents (if notified by owner).

The owner will continue to contract for necessary maintenance services and the Rental manager is hereby authorized to contact the following for emergency maintenance repairs. Rental manager will contact owner if said repair exceeds $200.00[.]

     *      *      *      *      *      *      *

Owner agrees to perform all advertising of said premises, to institute and prosecute actions to evict tenants and recover possession of premises, to sue and recover rents, and to settle and release such actions. In no event shall Rainbow Reservations be liable to the owner as long as the owner remains the principal rental agent. Rainbow Reservations agrees to collect any rents due owner, upon notification by owner before the arrival of guests.

     *      *      *      *      *      *      *

The owner shall compensate Rainbow Reservations for all above mentioned services by guaranteeing 20% commission on all daily rents collected by owner. It is agreed that all linen charges, maid services and check in supplies shall be paid by the owner. Owner will be responsible for paying his own transient tax fees to the State of Hawaii. In the event the owners [sic] unit is vacant for 30 days or more, owner will compensate Rainbow Reservations * * * [for the front desk services].

Under the addendum agreement, Rainbow Reservations collected the rent from petitioners' tenants and placed the funds into a trust account. Rainbow Reservations then deducted from the rental proceeds its commission and the costs of maid or other services it provided. At the end of each month, a check representing the net proceeds from the rental of the Maui condo was forwarded to petitioners. As part of this process, Rainbow Reservations maintained records of the rental proceeds for petitioners, and issued a Form 1099 to petitioners at the end of the year.

Although the addendum agreement provided that Rainbow Reservations would receive a 20-percent commission, Rainbow Reservations actually received a 25-percent commission during 1993 as a result of its performing special services for petitioners. Additionally, Rainbow Reservations was permitted to rent petitioners' Maui condo directly during times when the condo was vacant, subject to petitioners' approval. For those bookings, which only occurred once or twice during 1993, Rainbow Reservations earned a 40-percent commission.

As part of its front desk services, Rainbow Reservations issued keys and parking permits to petitioners' tenants (unless petitioners made other arrangements). The front desk was also available for petitioners' tenants to answer questions, obtain additional linens, or receive complaints.

The Maui condo was rented for 22 weeks during 1993, with an average stay for a tenant of 6.5 days. Petitioners' base charge

for the Maui condo was $80 per night, with additional fees for rollaway beds, the use of entertainment equipment, or daily linen or cleaning services which raised the rate to approximately $120 per night.

In between each booking, the maid service cleaned the Maui condo in preparation for the next tenant.

B. Molokai Condo

The front desk at the Wavecrest Resort was operated by one of the local residents at the resort. The front desk service included maid service which was provided at the end of each tenant's stay. There were no fixed hours at the front desk, and often phone calls were forwarded to an answering machine. The front desk lacked authority to make repairs or perform any work at the Molokai condo except in the case of emergencies. If the Molokai condo was not rented for extended periods of time, petitioners paid a special front desk fee. The Wavecrest Resort did not advertise its rental units.

Petitioners paid a commission of approximately 25 percent of gross receipts to the front desk at the Wavecrest Resort, in addition to a reserve account payment for capital improvements of common areas at the resort.

During 1993, petitioners rented out the Molokai condo for approximately 5 weeks. The average stay was 6.5 days, and the rental rates were the same as that for the Maui condo.

C. Petitioners' Participation in the Hawaiian Condos

To promote the Hawaiian condominiums during 1993, petitioners placed two advertisements in Hawaii Magazine, one each for the rentals of the Maui and Molokai condos. The advertisements ran for the entire year, and the magazine was released bimonthly. The advertisements listed petitioners' home telephone number for information on renting the condominiums.

Petitioners also marketed the Hawaiian condominiums through several travel agents during 1993. The travel agents referred clients to petitioners, and in exchange petitioners referred airline bookings and other travel and entertainment arrangements to the travel agents.

Further, Mr. Pohoski set up a worldwide web page on the Internet which described petitioners and displayed pictures of the Hawaiian condominiums. Additionally, as they traveled to different sites as part of their regular employment (Mr. Pohoski traveled to military installations, and Mrs. Pohoski traveled to hospitals), petitioners posted business cards on bulletin boards advertising the availability of their Hawaiian condominiums.

Petitioners received an average of two to three telephone calls per day regarding the rental of their Hawaiian condominiums, for a total of more than 500 calls during 1993. Petitioners also often received e-mail messages from prospective tenants. Telephone calls were usually received during the evenings and weekends when

petitioners were home, but if they were not home, messages were left on their home answering machine.

The telephone callers usually sought a description of the condominiums and their proximity to beaches, restaurants, stores, entertainment, and other major resorts. Most callers requested brochures and maps which petitioners mailed to the prospective tenants. Approximately 80 to 90 percent of the time, Mr. Pohoski replied in writing to the prospective tenants rather than by telephone because it was less expensive to mail information than speak on the telephone. Mr. Pohoski customized his letters to the prospective tenants to address their specific interests and concerns. Petitioners also made telephone calls to the prospective tenants, most of which took place during the evenings and weekends, and sometimes during the day from work.

When a reservation with a tenant was made, petitioners recorded the booking information (name of tenant, arrival and departure times, and rate) on a master calendar they maintained. Petitioners then contacted the front desk of the resort in which the tenant was booked and informed the front desk of the rental arrangements and the dates.

Petitioners maintained a database on their home computer of each of their tenants for future marketing purposes. Petitioners also tracked their income on a monthly basis in another database.

For 2 weeks during 1993, petitioners and their children went to Hawaii for a "working vacation". While there, Mr. Pohoski completed various maintenance and repair tasks at the Hawaiian condominiums. At the Maui condo where he worked approximately 10 days during their stay, Mr. Pohoski: Stripped the furniture and transported it for reupholstering; repaired the lanai furniture; cleaned sink traps; performed touchup painting; repaired and replaced the molding along the walls; installed cable wire for a second television; ran a telephone line into the bedroom; repaired the sliding screen and closet doors; purchased new bedspreads and curtains; and installed new shower heads, towel bars, and shelving units in the bathroom.

At the Molokai condo where he worked approximately 4 days during the working vacation, Mr. Pohoski: Repaired the garbage disposal and sink faucet; performed touchup painting; reglued moldings along the wall; repaired the sliding closet door; and replaced the shower head in the bathroom.

The materials and tools used for the maintenance and repair work at the Hawaiian condominiums were mostly purchased in Hawaii, but many were purchased on the U.S. mainland and shipped to Hawaii because of the high cost of such products in Hawaii.

## 2. Federal Income Tax Returns

Petitioners filed a joint 1993 Federal income tax return reporting an adjusted gross income of $75,910. On separate

Schedules C, Profit or Loss From Business, petitioners reported a net loss of $17,641 from the operation of the Maui condo, and a net loss of $16,336 from the operation of the Molokai condo. On both Schedules C, petitioners indicated that they materially participated in their rental activities.[2]

3. Notice of Deficiency

In the notice of deficiency, respondent disallowed petitioners' losses from the operation of their Hawaiian condominiums. In the parties' stipulation agreement, respondent concedes that the expenses incurred were ordinary and necessary trade or business expenses. Respondent also conceded at trial that substantiation is not being challenged. The passive activity loss rules under section 469(a) constitute respondent's sole basis for disallowing petitioners' losses from their Hawaiian condominiums.

OPINION

Issue 1. Passive Activity Losses

Pursuant to section 469(a) a passive activity loss is generally not allowed as a deduction for the year sustained. A passive activity loss is defined as the excess of the aggregate

---

[2] Petitioners filed a third Schedule C, Profit or Loss From Business, reporting a net loss of $11,714 from Mrs. Pohoski's home health care nursing business. Petitioners also filed a Schedule E, Supplemental Income and Loss, showing a net loss of $24,546 from the rental of their condominiums in Camarillo, California.

losses from all passive activities for the taxable year over the aggregate income from all passive activities for that year. Sec. 469(d)(1). Passive activities are those which involve the conduct of a trade or business and in which the taxpayer does not materially participate. Sec. 469(c)(1).

Rental activity ordinarily is treated as a passive activity regardless of whether the taxpayer materially participates. Sec. 469(c)(2), (4). An exception exists for rental activity in which the average rental does not exceed 7 days. Sec. 1.469-1T(e)(3)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). In the instant case, the parties agree that the average rental did not exceed 7 days.

Petitioners contend that they materially participated in the rental of both the Maui and Molokai condominiums, thus making section 469(a) inapplicable. Material participation in an activity is defined as regular, continuous, and substantial involvement. Sec. 469(h)(1). The participation of a spouse is taken into account in determining material participation. Sec. 469(h)(5).

A. Establishing Participation

As a preliminary matter, respondent asserts that petitioners failed to substantiate the extent of their participation in the rental of their condominiums in the manner contemplated by section

1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). That regulation provides as follows:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

At trial, petitioners introduced a narrative summary of their rental activities with respect to their participation in the Hawaiian condominiums in the form of a letter, dated October 17, 1996, to Ms. Ingrid Giammichele, an Internal Revenue Service (IRS) Appeals officer in California. The narrative summary details the expenses, time, and effort put forth by petitioners in operating their Hawaiian condominiums. Respondent claims, however, that the narrative summary is merely a postevent "ballpark guesstimate" that is insufficient to prove participation. See Carlstedt v. Commissioner, T.C. Memo. 1997-331; Speer v. Commissioner, T.C. Memo. 1996-323; Goshorn v. Commissioner, T.C. Memo. 1993-578.

Although petitioners' narrative summary is a postevent review of their 1993 participation with respect to the Hawaiian condominiums, we may nonetheless find the summary sufficient to establish petitioners' participation where it is supported by credible testimony and other objective evidence. See Harrison v.

Commissioner, T.C. Memo. 1996-509. Our acceptance of the narrative summary, however, does not require us to accept the accuracy of the amount of time petitioners claim they spent participating in the rental of the condominiums. Id.

Mr. Pohoski credibly testified that petitioners maintained contemporaneous records (although such records were not introduced at trial). These records included a calendar that indicated the name of the tenant, the daily rental rate, and the arrival and departure times for the tenants at the condominiums, as well as a database listing on petitioners' computer all prospective tenants. We believe that these records laid the foundation for petitioners to determine the amount of time they spent with respect to many of their rental activities as provided in the narrative summary.

Further, other evidence, such as the management contract between petitioners and Rainbow Reservations and the testimony of Marcia Alders, the sole shareholder and manager of Rainbow Reservations, supports petitioners' claims of their relative level of participation at the Maui condo. We thus conclude that petitioners have sustained their initial burden of establishing through reasonable means their participation in the rental of the Hawaiian condominiums.

B. Material Participation Safe Harbor

Petitioners assert that their rental of the Hawaiian condominiums satisfies the safe harbor requirements for material

participation provided in section 1.469-5T(a)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).[3]  That section provides for material participation if:

> The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year[.]

Id.

Respondent argues that (1) petitioners did not spend at least 100 hours participating in the rental of each of the Hawaiian condominiums, and (2) other individuals participated more in the activities than did petitioners.

We are satisfied that petitioners participated in the rental of their Hawaiian condominiums on a regular, continuous, and substantial basis.

At trial, Mr. Pohoski testified that he spent 800 hours participating in the rental of the two Hawaiian condominiums during 1993, 650 hours at the Maui condo, and 150 hours at the Molokai condo.  Of those total hours, Mr. Pohoski testified that 100 hours

---

[3]      In their pretrial memorandum, petitioners claimed that they satisfied the safe harbor requirements of sec. 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).  That section allows a finding of material participation if the taxpayer participates in the activity for more than 500 hours during the taxable year.  At trial, Mr. Pohoski testified that he and Mrs. Pohoski spent 650 hours working on the Maui condominium.  However, in their posttrial brief, petitioners did not address this safe harbor and conceded that they spent only 325.50 hours working on the Maui condominium.

of repair and maintenance work was completed during petitioners' 2-week working vacation in Hawaii at the Maui condo, and 50 hours of work was completed at the Molokai condo. Further, Mr. Pohoski testified that he spent between 5 and 15 minutes talking with each prospective tenant who called, between 30 minutes and 1 hour each week talking with travel agents, 80 hours creating a web page for the Internet, 30 to 45 minutes per day checking his e-mail, and 2 hours per month posting business cards when he or Mrs. Pohoski traveled to different sites as part of their employment.

On brief, petitioners reduced their total claimed hours of participation in the Hawaiian condominiums to 601 and provided a breakdown of these hours as follows:

| Activity | Hours at Maui | Hours at Molokai | Total Hours |
|---|---|---|---|
| Telephone calls from prospective renters | 41.5 | 41.5 | 83 |
| Travel agent contact | 19.5 | 19.5 | 39 |
| Web page construction | 40.0 | 40.0 | 80 |
| E-mail responses to prospective renters | 112.5 | 112.5 | 225 |
| Posting 3 x 5 cards at bases, in public areas | 12.0 | 12.0 | 24 |
| Repairs and decorating of Hawaii condos | 100.0 | 50.0 | 150 |
| Total | 325.5 | 275.5 | 601 |

Despite our concluding, supra, that petitioners satisfied their intitial burden of proof, we find several problems with petitioners' claim of time spent participating in the rental of their Hawaiian condominiums.  Cf. Harrison v. Commissioner, supra. First, petitioners' claim of 150 hours of work during their Hawaiian "working vacation" is implausible.  Assuming petitioners actually stayed for 14 days, their claim would amount to an average of 10.7 hours of work per day, which was apparently performed only by Mr. Pohoski because no testimony presented ever referred to work performed by Mrs. Pohoski while in Hawaii.  Yet there was never any discussion of breaks for meals, travel, or leisure time with the family--all of which certainly occurred.

Second, the breakdown of time spent on telephone calls from prospective tenants, travel agent contacts, and e-mail responses to prospective tenants is suspicious.  Petitioners allocate the total time evenly between the Maui and Molokai condos, yet they clearly had much more success in renting the Maui condo than the  Molokai condo.  We find it unlikely that an equal amount of time was spent with regard to each condominium, and we find that less time was spent with respect to the Molokai condo.

Third, we find the time spent with respect to checking and responding to e-mail excessive.  Mr. Pohoski's testimony suggested many more telephone calls than e-mail responses, yet much more time was allocated to checking and responding to his e-mail than calling

back or writing prospective tenants.  Additionally, it is likely that petitioners received e-mail other than that relating to the renting of their Hawaiian condominiums, and that such time was included in the 225 hours allocated to checking the e-mail.

Finally, we are mindful that petitioners were full-time employees, each working 40 hours per week, and were the sole managers of their Camarillo, California, condominiums.

Using our best judgment, we find that petitioners spent between 200 and 250 hours participating in the rental of their Maui condo rather than the 325.5 hours proposed by petitioners.  We further find that petitioners spent less than 100 hours participating in the rental of their Molokai condo, rather than the 275.5 hours proposed by petitioners.  However, there still remains the question of the amount of time spent by others working on the rental of petitioners' condominiums.

We first consider the Maui condo.  Ms. Alders testified that the front desk spent approximately 5 to 10 minutes checking in a tenant for petitioners' Maui condo.  Mr. Pohoski estimated that the maid service spent an average of 2 to 3 hours cleaning the Maui condo after the departure of a tenant.  Ms. Alders opined that petitioners "spent far more time" in operating the Maui condo than Rainbow Reservations.  No testimony was presented with respect to participation by other individuals at the Maui condo, nor was testimony given with respect to the Molokai condo.

Petitioners claim that Ms. Alders' testimony is sufficient to satisfy the requirement that they spent more time operating the Maui condo than any other individual. Indeed, we find that petitioners clearly spent more time than Rainbow Reservations in marketing, renting, and repairing the Maui condo.[4] Cf. Chapin v. Commissioner, T.C. Memo. 1996-56.

Respondent asserts, however, that petitioners have failed to take into consideration the front desk contract between Rainbow Reservations and the Homeowners' Association, of which petitioners were members. Under that contract, Rainbow Reservations operated the front desk for all condominiums, regardless of whether a management contract was executed. As part of that contract, Rainbow Reservations agreed to check in and out all tenants at the Valley Isle Resort, issue parking permits, and answer questions or assist tenants during the front desk business hours of between 8 a.m. and 5 p.m. As a result, the front desk was available 9 hours per day, 7 days per week, to assist the tenants of each condominium

---

[4] If checking in and out each tenant at the front desk took a total of 30 minutes, and maid service took an additional 3 hours each time a tenant departed, the total time spent by the front desk and cleaning personnel for the 22 weeks petitioners' Maui condo was rented would be 77 hours. We do not believe that the front desk's other responsibilities, including rent collection and disbursements, additional linen or maid service, or other special services, consumed more than another 120 hours, or at least not more than petitioners' participation time.

at the Valley Isle Resort.[5]  Further, Mr. Pohoski admitted under cross-examination that the front desk services were necessary in the operation of the Maui condo, and it would have been very difficult and inconvenient otherwise.

Respondent argues on brief that: "All of the hours that * * * [the front desk was] open and available should be counted as time spent by them in connection with the [rental] activity.  The time spent by the front desk operators should not be divided among the units for which they were responsible."  As support for this argument, respondent directs the Court to Goshorn v. Commissioner, T.C. Memo. 1993-578, and Serenbetz v. Commissioner, T.C. Memo. 1996-510.  Respondent has misinterpreted these cases.

In Goshorn v. Commissioner, supra, the taxpayers owned a 28-foot sailboat which they docked at a marina near Dallas, Texas, while they were living in Connecticut.  An arrangement was made for the marina to rent out the sailboat for charters during the year.  The taxpayers claimed to have spent more time than the marina staff in operating and maintaining the boat.  In rejecting the taxpayer's claim, we reasoned that "all of the activity that directly related to the actual rental of the boat was performed by the Marina and not by petitioner."  Id.  (Emphasis added.)  Applying this

---

[5]     The front desk operated by Rainbow Reservations was available to assist petitioners' tenants for 9 hours per day, 7 days per week, for 22 weeks during 1993 (the number of weeks the Maui condo was rented), for a total of 1,386 hours.

reasoning to the situation herein before us, we examine only the actual services performed by Rainbow Reservations in support of the Maui condo, and not services that are not directly related to petitioners' rental. In this regard, it is evident that the time spent checking tenants in and out, the maid services, the managing of the rent collection and disbursements, and the other few miscellaneous tasks performed by Rainbow Reservations for petitioners did not exceed 200 hours during 1993, and certainly did not exceed the time spent by petitioners. We do not believe it appropriate to consider as participation for purposes of determining whether petitioners qualify for the safe harbor under section 1.469-5T(a)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), the mere availability of the front desk personnel.

In Serenbetz v. Commissioner, supra, the taxpayers owned a Vermont condominium which was part of a partnership that rented out the condominiums to third parties. The day-to-day operation of the partnership was managed by an on-site staff of nine employees who conducted the marketing and renting of the condominiums and maintained the books and records. The taxpayers attempted to prove that they spent more time than the on-site staff in operating their rental by dividing the total number of staff hours worked by the number of employees (9) and by the number of condominium units in the partnership (40). We rejected the taxpayers' methodology

observing: "The language of sec. 1.469-5T(a)(3), Temporary Income Tax Regs., contains nothing which suggests that participation should be computed on a per unit basis. See Goshorn v. Commissioner, T.C. Memo. 1993-578." Id.

We believe that only the actual time spent on a rental is relevant to determining whether a taxpayer materially participates in that rental. In the case herein, unlike Goshorn and Serenbetz, petitioners have provided ample evidence of both their level of participation and that of Rainbow Reservations with respect to the Maui condo. Cf. Scheiner v. Commissioner, T.C. Memo. 1996-554. As stated previously, petitioners' efforts far exceeded that of Rainbow Reservations personnel at the Maui condo. Thus, we hold that petitioners materially participated in the rental of their Maui condo during 1993. Consequently, petitioners may deduct the losses sustained therefrom.

We now turn our attention to the Molokai condo in which we have already found that petitioners participated less than 100 hours. Assuming arguendo that petitioners participated for more than 100 hours in the rental of the Molokai condo, petitioners offered no evidence of the time spent by other individuals in the rental of that condominium. See Chapin v. Commissioner, supra. Petitioners assert that the lack of a fixed front desk service at the Wavecrest Resort prevents a finding that any individual spent more time than they did in operating the Molokai condo.

Petitioners, however, are required to put forth some indication of the actual time spent by the Wavecrest Resort staff during 1993, including the front desk services during the 5 weeks that petitioners rented out the Molokai condo, maid service, and any other services performed by others. See <u>Goshorn v. Commissioner</u>, <u>supra</u>. Petitioners did not do so. Consequently, we are unable to conclude that petitioners' participation in the rental of their Molokai condo was greater than others.[6] See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933). Thus, we hold that petitioners did not materially participate in the rental of their Molokai condo.

To summarize, the losses sustained by petitioners during 1993 in the operation of their Maui condo are deductible, and the losses sustained in the operation of their Molokai condo are passive activity losses, and thus nondeductible, pursuant to section 469(a).

<u>Issue 2. Accuracy-Related Penalty</u>

Section 6662 imposes an accuracy-related penalty equal to 20 percent of the portion of the underpayment attributable to a substantial understatement of tax. Respondent seeks to impose the penalty with respect to Mrs. Pohoski's claimed Schedule C expenses for her work as a nurse, and for petitioners' claimed passive

---

[6] For the same reasons, petitioners' assertion on brief that they may also come within the safe harbor provided in sec. 1.469-5T(a)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), must fail.

activity losses with respect to the Hawaiian condominiums (which as a result of our holding above refers only to the Molokai condo). Petitioners did not address this matter on brief, but generally suggested at trial that they had substantial authority for the reporting of their rental activities.

A substantial understatement means an understatement which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1). The understatement is reduced by that portion of the understatement for which the taxpayer had substantial authority. Sec. 6662(d)(2)(B)(i).

The substantial authority standard requires an objective examination of the law and the application of the law to the relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities' supporting contrary treatment. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. Among the authorities a taxpayer may rely upon are IRS information or press releases, and notices, announcements, and other administrative pronouncements published in the Internal Revenue Bulletin by the IRS. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.

Mr. Pohoski testified that he relied upon IRS Publication 925, Passive Activity and At-Risk Rules. Assuming arguendo that Publication 925 is authority, Mr. Pohoski testified that he only

relied upon that publication for the requirements relating to record keeping, not for determining whether petitioners' activities qualified as material participation. Thus, petitioners have failed to prove that they had substantial authority for reporting material participation in the Hawaii condominiums. See <u>Swicegood v. Commissioner</u>, T.C. Memo. 1989-467.

Petitioners offered no testimony with respect to Mrs. Pohoski's Schedule C expenses relating to her nursing work. Rule 142(a).

Thus, we hold that petitioners are liable for the accuracy-related penalty, pursuant to section 6662, with respect to the Molokai condo and Mrs. Pohoski's nursing activities.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.