T.C. Memo. 2014-65

UNITED STATES TAX COURT

STEFAN A. TOLIN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17318-08.                    Filed April 9, 2014.

Richard W. Craigo, for petitioner.

Ardney J. Boland, III and Emile L. Herbert, III, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined deficiencies in petitioner's Federal

income tax for 2002, 2003, and 2004 of $10,256, $13,179, and $24,231,

respectively, and additions to tax under section 6651(a)(1) of $2,564, $1,977, and

[*2] $6,058, respectively.[1]  After concessions,[2] the sole issue for decision is whether losses petitioner sustained in the operation of a thoroughbred horse breeding and racing activity (thoroughbred activity) were passive activity losses.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  Petitioner resided in Minnesota at the time he filed the petition.

Petitioner became licensed to practice law in Minnesota in 1977 and maintained a general solo practice in Minneapolis throughout the years at issue. He also devoted significant time to the thoroughbred activity, which involved his effort to profit from breeding a stallion he owned named "Choosing Choice".  At trial petitioner estimated that he had practiced law for 1,200 hours in 2002, 1,100 hours in 2003, and 1,000 hours in 2004.  The result in this case turns on the amount of time he devoted to the thoroughbred activity in each of those years.

---

[1]All section references are to the Internal Revenue Code of 1986, as in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[2]The parties filed a stipulation of agreed issues and a supplemental stipulation of agreed issues that settle all issues in this case except the one addressed herein.

[3]The parties agree that the addition to tax under sec. 6651(a)(1) will apply to any deficiency in petitioner's income tax derived from a passive activity loss disallowance under sec. 469.

**[*3]** Background

Petitioner has enjoyed horse racing since he was an adolescent. He became involved in thoroughbred horse breeding and racing in 1990 when he purchased his first racehorse, a Minnesota-bred yearling (a one-year-old horse). He was representing a client before the Minnesota Racing Commission at the time, and it was his exposure to the industry through this representation that motivated his purchase. The following year petitioner bought a mare from the trainer he had hired to train the yearling. The mare had knee problems and could no longer race, so petitioner moved the horse to Florida in 1992 and bred it to a stallion there.

Choosing Choice was foaled by petitioner's mare in 1993. Petitioner sent Choosing Choice to trainers in Florida and Texas in 1994 and 1995, respectively, who prepared the horse for racing. Choosing Choice's racing career began at the Sam Houston Race Park in Texas in September 1995. He exhibited prodigious speed as a two-year-old,[4] running undefeated in four races at Sam Houston that year, including the Houston Juvenile Stakes.[5]

---

[4]All foals born during a given calendar year are treated as though they were born on January 1 of that year.

[5]Choosing Choice finished third in the only other race he ran in 1995, at a race course in New Orleans, Louisiana.

**[*4]** In January 1996 petitioner moved Choosing Choice to Oaklawn Park in Arkansas, a venue that offered higher purses and better competition than was available at Sam Houston. Choosing Choice ran well in his first races at Oaklawn, finishing third in a stakes race and winning an allowance race with a $30,000 purse. Given that success, petitioner entered Choosing Choice in the Southwest Stakes and the Rebel Stakes, graded stakes races with fields that included some of the most highly regarded three-year-old thoroughbreds in the country. Choosing Choice finished out of the money in the Southwest Stakes, but he held the lead for most of the $100,000 Rebel Stakes and was neck-and-neck on the stretch with the eventual winner (a horse named Ide) when he suffered a slab fracture in his right front leg.[6]

The injury prevented Choosing Choice from racing for the remainder of 1996 and all of 1997. He ran seven times in 1998, primarily shorter races at tracks in Maryland and Virginia, before suffering a second, more serious leg injury that prematurely ended his racing career. Overall, Choosing Choice won 6 of the 16 races he ran, finished third in 3 others, and earned $77,638.

---

[6]Choosing Choice finished the race three lengths behind Ide. Famed jockey Garrett Gomez rode Choosing Choice in the Rebel Stakes.

**[*5]** Petitioner believed that Choosing Choice could become a profitable stud horse because of his racing ability. He engaged a thoroughbred consultant who specialized in pedigree analysis, commonly known as "nicking", to research and analyze Choosing Choice's pedigree. Nicking is based on the premise that past success in crossing the sire bloodlines of a stallion and a broodmare makes it more likely that they will produce a successful racehorse if bred together than if bred to mates with less compatible bloodlines. Those who perform nicking analyses use letter grades to denote the compatibility between the bloodlines of a hypothetical mating pair. The results of Choosing Choice's nicking analysis were promising; he had an "A++ Nick Rating" (based on crossing the bloodlines of his sire and dam), and his bloodlines were highly compatible with most of the American mare population.

In early 2000, when Choosing Choice recuperated from his second leg injury, petitioner had him transported to a horse breeding farm in New Mexico where his stud services were first offered for sale. Choosing Choice arrived at the farm in the middle of the 2000 breeding season;[7] there was little interest generated in his stud services; and he was bred to only a few mares that year. Dissatisfied,

---

[7]The thoroughbred breeding season generally begins in the middle of February and goes through the end of June.

[*6] petitioner moved Choosing Choice to a horse farm in Texas for the 2001 breeding season. Petitioner had immediate problems with the Texas farm, including his belief that the owner was directing interested breeders away from Choosing Choice in favor of other stallions standing at the farm, so he soon began looking for a new place to breed Choosing Choice.

After doing some research and discussing the situation with his thoroughbred consultant, petitioner decided to breed Choosing Choice in Louisiana beginning in 2002. His decision was influenced by a number of Louisiana laws that incentivized the in-State ownership, breeding, and racing of thoroughbred horses. See La. Rev. Stat. Ann. secs. 4:141, 4:142, 4:165 (West 2011). The State's four racetracks had recently been allowed to obtain licenses to conduct slot machine gaming and were required to use a portion of their net slot machine proceeds to supplement racing purses. See 1997 La. Sess. Law Serv. Act 721 (West); see also La. Rev. Stat. Ann. sec. 27:361(A) and (B) (West 2011). Louisiana also made sizable annual appropriations for special "stallion awards" and "breeder awards" which were paid to the owners of the sires and dams of Louisiana-bred thoroughbred horses that finished first, second, or third in certain stake, handicap, or allowance races. La. Rev. Stat. Ann. sec. 4:165(A); see also La. Rev. Stat. Ann. secs. 4:177, 4:218.

[*7]  Petitioner owned three mares that he bred to Choosing Choice in 2001.  He planned on breeding the mares to Choosing Choice every year and having the resulting foals sold or trained to race.  By breeding Choosing Choice in Louisiana, petitioner would become eligible to earn stallion awards in addition to any stud fees he charged.  See La. Rev. Stat. Ann. sec. 4:165(A)(3), (4)(c).  He would also receive any breeder awards attributable to the racing success of his mares' foals, beginning with the first crop of foals born in the State, and would benefit from the more lucrative racing purses if he owned the horses when they became successful racers.  See id. sec. 4:165(A)(2), (4)(a) and (b).  Accordingly, he began making arrangements to move his breeding operation.

Among the first things petitioner did was telephone Thomas Early, the secretary-treasurer of the Louisiana Thoroughbred Breeders Association (LTBA),[8] to introduce himself and inquire generally about thoroughbred breeding in Louisiana.  As its name suggests, the LTBA, then and now, is an organization that seeks to coordinate and develop the thoroughbred horse industry in Louisiana.  Its membership consisted of approximately 800 thoroughbred horse breeders during the years at issue.  The LTBA implemented and was responsible for administering

---

[8]Mr. Early had over 30 years of experience with thoroughbred breeding and racing in Louisiana at the time.

[*8] the breeding incentive program; subject to certain legislative guidelines, it maintained a register of the horses involved in the program, established the schedule or formula by which the stallion and breeder awards were paid, and disbursed these awards to those entitled to receive them. Id. sec. 4:165(A), (C), 4:178.

In late spring 2001 petitioner began searching for a suitable place to stand Choosing Choice and board the three mares. He first considered a number of the well-known farms near New Orleans but was deterred by the rates they charged to stand a stallion, the many stallions standing at each farm, and the lack of control he anticipated having over the promotion of Choosing Choice if he were to select such a venue. Petitioner eventually called James "Butch" Sebastien who, with his wife Linda, owned and operated Sebastien Farms in Washington, Louisiana, which bred, raised, sold, and boarded thoroughbred horses.[9] The Sebastiens maintained a broodmare band of about 12 and owned the only stallion standing at their farm at the time. During the call Mr. Sebastien expressed interest in Choosing Choice and

---

[9]Sebastien Farms consisted of 84 acres of land on which the Sebastiens kept between 50 and 70 horses during the years at issue. The Sebastiens both had full-time jobs unrelated to Sebastien Farms. They each spent approximately 25 hours per week working on their farm and employed two individuals who each worked approximately 35 hours per week.

**[*9]** asked petitioner to send him a video and pedigree of that stallion, which petitioner did.

Mr. Sebastien reviewed the materials petitioner sent and was quite impressed with Choosing Choice's speed--particularly in races of less than one mile[10]--and agreed that if Choosing Choice could duplicate himself he would be a "home run" in Louisiana, where a great majority of the races were six furlongs. Petitioner and Mr. Sebastien subsequently reached a verbal agreement whereby Choosing Choice would stand at stud at Sebastien Farms and the Sebastiens would board petitioner's three mares. Petitioner had the horses transported from Texas to Sebastien Farms in August 2001.

In early October 2001 petitioner visited Washington, Louisiana, where he met the Sebastiens, toured their farm, and negotiated the terms of his arrangement with Mr. Sebastien, which were memorialized in a "Stallion Standing & Boarding Agreement" dated October 7, 2001. Therein, petitioner agreed to pay Mr. Sebastien daily fees for standing Choosing Choice and boarding the mares and also agreed to split with Mr. Sebastien the stud fees received during the first four years of the contract after expenses, including board, were deducted; thus, during

---

[10]Five of Choosing Choice's six wins were in races of seven furlongs or less.

[*10] the years at issue, Mr. Sebastien was to receive the greater of the standing fee provided in the contract or one-half of the net stud fees in return for standing Choosing Choice. Mr. Sebastien was also given the right to breed his mares to Choosing Choice without charge as well as the right to any stallion awards attributable to the resulting foals.[11] Petitioner reserved at his own expense the sole responsibility of producing "any necessary videotapes and breeding information packages marketing Choosing Choice".

During the same trip Mr. Sebastien introduced petitioner to his friend Bud Thibodaux. Mr. Thibodaux had been involved in thoroughbred horse breeding and racing in Louisiana for over 35 years as an owner, adviser, and bloodstock agent[12] and had extensive knowledge of the industry in the State. They spoke at length at a lunch arranged and attended by Mr. Sebastien about marketing Choosing Choice's breeding services, and Mr. Thibodaux agreed to provide petitioner advice and assistance as he began breeding his stallion in Louisiana.[13]

---

[11]Petitioner retained the right to stallion awards attributable to any other foals.

[12]Generally speaking, a bloodstock agent arranges transactions between buyers and sellers of horses. Bloodstock agents are valuable for their knowledge of the industry and its trends and generally work on a commission basis.

[13]Mr. Thibodaux did not charge any fee for his consultation.

[*11] Two months later petitioner visited New Orleans to join the LTBA and attend Louisiana Champions Day, a program of stakes races limited to Louisiana-bred horses put on by the LTBA at the Fair Grounds Race Course the second weekend of every December. In addition to the races, Champions Day weekend featured a breeders banquet and a charity auction of donated stallion seasons. The Champions Day events provided petitioner his first opportunity to meet and network with a large group of Louisiana horse breeders. He donated a stallion season to the charity auction and spent the weekend promoting Choosing Choice in anticipation of the 2002 breeding season.

Overview of the Thoroughbred Activity During the Years at Issue

The ultimate success of the thoroughbred activity depended on the racing success of Choosing Choice's progeny. If some of the foals sired by Choosing Choice became accomplished racehorses, more breeders would pay to breed their mares to Choosing Choice and petitioner would be more likely to earn stallion awards. Moreover, he could earn breeder awards if the foals of his broodmares developed into successful racers. Petitioner was confident that Choosing Choice's offspring would inherit his speed and that the stallion would become recognized as a proven producer of capable racehorses if petitioner could breed him to at least 15 to 20 mares for five or six consecutive breeding seasons. Accordingly, petitioner's

[*12] primary goal during the years at issue was to breed Choosing Choice to as many suitable mares as possible in order to get "foals on the ground".

Petitioner faced two significant challenges in accomplishing that goal. First, many breeders are hesitant to breed to a stallion until they can gauge how well that stallion's progeny perform at the track, and Choosing Choice had not sired any foals that were old enough to race at the beginning of 2002. Second, petitioner was new to thoroughbred breeding in Louisiana--he began considering it as a place to breed his stallion only in early 2001. Thus he was not known by the local breeders and was generally unfamiliar with the scene. And while Choosing Choice had had a period of racing success in the region, that was six years before petitioner's breeding him in Louisiana, and he had run only one race in the State.

Nonetheless, petitioner was determined to prove Choosing Choice as a stallion. He had developed some knowledgeable contacts, namely Messrs. Thibodaux and Early, who were willing to advise him as he began breeding Choosing Choice in Louisiana, and he had entered into a business relationship with Mr. Sebastien that would be mutually beneficial if Choosing Choice was widely bred and ultimately successful. Petitioner remained in continual contact with these individuals throughout the years at issue, primarily by telephone calls he initiated, and relied on them for knowledge and advice as he developed the

**[\*13]** thoroughbred activity. Ultimately, petitioner believed he could overcome the difficulties inherent in attracting customers by heavily promoting Choosing Choice--a task he explicitly reserved for himself in the contract with Mr. Sebastien--and stallion promotion was his primary focus during the years at issue.

The bulk of petitioner's promotional efforts involved his personal solicitation of individuals to breed their mares to Choosing Choice. He made these overtures by long-distance communication from Minneapolis and in person during multiple visits to Louisiana each year. Petitioner used the LTBA's "2002 Farm & Service Directory", which provided the location and contact information of each of the association's approximately 800 members, to familiarize himself with local breeders and identify potential customers. He also consulted frequently with Messrs. Thibodaux and Sebastien regarding breeders they knew and tried to determine which ones would be most interested in his stallion. Petitioner telephoned the breeders he discussed with Messrs. Thibodaux and Sebastien and made "cold calls" to other breeders he selected from the LTBA directory to pitch them on breeding their mares to Choosing Choice. Although most of his efforts were focused on Louisiana, petitioner contacted a number of breeders in other States and tried to interest them in Choosing Choice.

**[\*14]** When solicited breeders expressed interest in Choosing Choice, petitioner would follow up by mailing them a promotional breeding package.[14] The breeding package contained pictures of Choosing Choice, copies of Choosing Choice's race result charts, newspaper articles about Choosing Choice, a copy of Choosing Choice's nicking analysis, and a video compilation of Choosing Choice's notable races. Petitioner also included a letter in each breeding package that described Choosing Choice's racing career and provided information about the stallion's pedigree. Petitioner personalized the letters by discussing the hypothetical mating cross between his stallion and any of the solicited breeder's mares that were identified during their previous telephone conversations.[15]

In addition to his telephone solicitations, petitioner designed full-page print advertisements for Choosing Choice's breeding services and had them placed in the "Louisiana Horse" and "Louisiana Stallion Register" in each of the years at issue. Both publications were published by the LTBA and concerned thoroughbred horse breeding in Louisiana. The stud fee for Choosing Choice

---

[14]Much of petitioner's promotional work in Minnesota was done at his law office.

[15]Petitioner was interested in and knowledgeable about pedigree analysis and emphasized it in many of his communications with breeders.

[*15] quoted in the print advertisements and provided in the letters accompanying the breeding packages was $1,000 for a live foal.

The print advertisements directed inquiries to Mr. Sebastien, and breeders visited Sebastien Farms from time to time to see and discuss the stallion. As a result, Mr. Sebastien was the only contact for a number of individuals who bred their mares to Choosing Choice. Because petitioner's ultimate goal was to breed Choosing Choice to as many acceptable mares as possible, he gave Mr. Sebastien authority to discount the stud fee, and Mr. Sebastien exercised that authority on occasion but only after receiving approval from petitioner. All of the breeding took place at Sebastien Farms and was handled by the Sebastiens and/or their employees. Each year, in addition to mares owned by petitioner's customers, Choosing Choice was bred to all of petitioner's mares and about a half dozen of the Sebastiens'.

Petitioner monitored activities at Sebastien Farms in daily telephone conversations with the Sebastiens which occurred throughout the years at issue. Petitioner initiated the great majority of these calls. The conversations were always related to various aspects of the thoroughbred activity including the condition of petitioner's horses, their care, any breeders who had shown interest in Choosing Choice, and the results of petitioner's promotional efforts.

**[\*16]** Because of the breeder awards and other financial opportunities presented by the foals of petitioner's mares, planning for and monitoring their development was a secondary focus of the thoroughbred activity. The Sebastiens provided boarding and general care, but they did not train young horses to race or prepare them for sale. Therefore, when petitioner's foals were yearlings he arranged to have them moved to facilities that specialized in such things. He consulted with Mr. Thibodaux and contacted a number of horse sales companies he knew in Texas and Florida in an effort to determine which course of preparation was best for a given foal and who could best provide it. Once his horses arrived at the facilities he selected, petitioner called frequently to provide instructions regarding their care and to discuss the training or sales process.

Although he did much of his work in Minnesota, petitioner made 14 three-to-five-day trips to Louisiana during the years at issue. He tried to maximize the benefit of his limited opportunities for in-person interactions by meeting with as many people as possible while there. This required petitioner to travel extensively in-State, and he always rented a car upon arriving in Louisiana to facilitate such travel. Generally, petitioner scheduled his trips around a certain event or with a primary objective, such as attending an LTBA function or a series of meetings with individuals who cared for his horses. He spent much of the remaining time

[*17] driving to nearby horse farms where he met with the owners and managers and tried to interest them in Choosing Choice.[16]

In addition to his primary activities, petitioner performed administrative and peripheral tasks related to the thoroughbred activity. He reviewed and paid bills, kept the books, and arranged for mortality insurance on Choosing Choice. He also completed the annual paperwork required to register his horses with the LTBA, the Breeders' Cup, and the Jockey Club, which was necessary to make them eligible for the various awards offered by those organizations. Finally, petitioner subscribed to and read a number of publications relating to the thoroughbred horse industry and attended seminars regarding equine health problems.

2002

In January 2002 petitioner organized his promotional campaign for Choosing Choice's first breeding season in Louisiana. He began studying the LTBA directory and consulting Messrs. Thibodaux and Sebastien regarding prospective customers. He prepared and placed an advertisement in that year's Stallion Register and gathered the documents he wanted to include in the promotional breeding packages, from which he assembled a master copy.

---

[16]Petitioner distributed materials similar to those contained in the promotional breeding packages at these in-person meetings.

[*18] Petitioner also oversaw editing work to the video of Choosing Choice's notable races so that an improved version could be included in the breeding packages. Once his materials were prepared, he began making sales calls to breeders.

Petitioner's early promotional efforts generated some interest in Choosing Choice. He mailed breeding packages to approximately 40 breeders in 2002. Most of those packages were sent early in the year and related to the 2002 breeding season; however, petitioner soon learned that some breeders made their mating decisions well in advance of the breeding season, so he continued his long-distance promotion year round and mailed a number of packages relating to the 2003 breeding season in the later months of 2002.

In addition to his telephone conversations with Mr. Thibodaux, Mr. Sebastien, and numerous breeders, petitioner spoke by phone with Mr. Early a great deal in 2002. Being new to thoroughbred breeding in Louisiana he had many questions for Mr. Early about the incentive programs and the rules and customs of the LTBA. Petitioner also called frequently to discuss ways to promote Choosing Choice and to pitch Mr. Early on breeding his own mares to the stallion.

[*19] Petitioner traveled to Louisiana twice during the 2002 breeding season, in early April and in early June. For both trips he flew into Baton Rouge and stayed with the Sebastiens in Washington. During the first visit petitioner conferred with Mr. Thibodaux and Mr. Sebastien and visited various horse farms in south central Louisiana to promote Choosing Choice's stud services to the owners. The second visit entailed similar activities, and in addition petitioner inspected three new foals of his broodmares sired by Choosing Choice. On his promotional visits to farms in the area, he was also able to compare the foals there to his own.

The total number of mares bred to Choosing Choice in 2002 cannot be determined with precision from the record. However, Messrs. Thibodaux, Sebastien, and Early all testified that Choosing Choice exceeded their expectations for a first-year stallion in Louisiana, and the evidence suggests that the number surpassed petitioner's threshold goal of 15 to 20 mares and may have been as high as 37.[17]

Petitioner began planning for the 2003 breeding season shortly after the 2002 season ended. He decided it was advisable to acquire more mares for his breeding program, and he took a four-day trip to Louisiana in August 2002 during

---

[17]Stallion breeding in Louisiana was competitive; during the years at issue there were roughly 200 to 250 stallions and 3,000 to 3,500 broodmares in the State.

[*20] which he stayed at Sebastien Farms and traveled to area farms recommended by Mr. Thibodaux to shop for mares (although he did not purchase one) and to promote Choosing Choice. He also inspected his own horses and took photographs of the new foals to include in his advertisement for the 2003 Stallion Register. Petitioner made another four-day trip to Louisiana in November 2002 to visit Sebastien Farms and confer with Mr. Sebastien concerning planning for the upcoming breeding season.

Petitioner's fifth and final trip to Louisiana in 2002 was to New Orleans for Louisiana Champions Day weekend in December. As in the previous year he attended the races and banquet, donated one of Choosing Choice's stallion seasons to the charity auction, and promoted Choosing Choice to the other breeders in attendance. In addition to attending Champions Day, petitioner visited various breeding farms north of Lake Pontchartrain to promote Choosing Choice, and he met with several trainers to discuss his soon-to-be yearlings.

2003

The breeding aspect of petitioner's thoroughbred activity changed little in 2003. He continued his long-distance promotional activities and mailed breeding packages (updated by him to include his three new foals sired by Choosing Choice) to nearly 50 breeders that year. Likewise, his methods of in-person

[*21] promotion were generally unchanged, although he traveled more extensively within Louisiana in 2003, so he was able to visit more farms and venues outside the south central part of the State.

The expansion of petitioner's in-State travel was attributable to his desire to find suitable places for his yearlings' development. Those yearlings represented petitioner's first opportunity to prove his stallion because they would reach racing age one year before any other Louisiana-bred foals sired by Choosing Choice.[18] He obtained the advice of Mr. Thibodaux and others in investigating the best training available in the area.

Petitioner's trips to Louisiana in 2003 included a five-day visit in March wherein, in addition to visiting Sebastien Farms to inspect his foals and confer with Mr. Sebastien, he also visited a farm in Doyline (in the northwest area of the State) where one of his yearlings eventually received training for four months of that year. Petitioner also visited farms in the south central area near Sebastien Farms to inspect new foals and promote his stallion.

Petitioner traveled to Louisiana again in late July. At Sebastien Farms, he inspected two new foals that had been sired by Choosing Choice with his own mares and also visited several farms in the south central region boarding foals

---

[18]One of the three yearlings died as a result of an accident in January 2003.

[*22] sired by Choosing Choice as a result of petitioner's promotional efforts. On these visits, petitioner sought to interest the farm owners in further use of Choosing Choice's stud services. He also visited the farm in Doyline where one of his yearlings was being trained as well as a number of other farms in the northwest region to promote Choosing Choice.

In November 2003 petitioner arranged to have his two yearlings moved to the Folsom Training Center in Folsom, Louisiana. In December, petitioner made a third trip in 2003 to Louisiana, traveling to New Orleans to attend Champions Day weekend. While there, he twice visited the Folsom Training Center to inspect his yearlings and discuss their training programs. He also visited farms in the area to promote Choosing Choice and then drove to Sebastien Farms to inspect his horses and confer with Mr. Sebastien about the upcoming breeding season.

2004

The 2004 breeding season was Choosing Choice's third in Louisiana. According to Mr. Early, a stallion in his third or fourth season is perhaps the most difficult to promote because his first foals are approaching racing age, and at that point many breeders will wait to see whether his progeny can run before breeding

[*23] to him.[19]  Nonetheless, petitioner's promotional efforts and the first crop of foals (resulting from the 2002 breeding season) had generated some exposure for Choosing Choice, and petitioner continued to heavily promote the stallion in 2004, sending breeding packages to more than 50 breeders and maintaining his in-person solicitations.[20]  He also devoted significant attention to the training of his two-year-olds, which would become eligible to race in the middle of the year, in an effort to ensure racing success that would bolster the reputation of Choosing Choice's progeny.

Petitioner's two-year-olds continued training at the Folsom Training Center for most of 2004, and he arranged for his two yearlings to begin training there in July and October, respectively.  However, neither of his two-year-olds commenced racing in 2004.  Only one of petitioner's mares gave birth to a foal in 2004 at Sebastien Farms, where the foal remained for the rest of the year.

Petitioner traveled to Louisiana six times in 2004.  During each of his first three trips, in February, May, and August, he worked in both the Folsom area and

_____

[19]The first couple of years are also tough, but breeders are generally more likely to test the waters and breed to a new stallion with a good pedigree in his first two years than the next two years, according to Mr. Early.

[20]His promotional efforts were relatively effective as Choosing Choice was bred to approximately 20 mares in 2004.

[*24] in the south central part of the State, meeting with the individuals who were caring for and training his horses and promoting Choosing Choice. In October petitioner attended a two-day yearling auction put on by the LTBA in Shreveport,[21] met with a farm owner in Alexandria who would care for one of his yearlings, and traveled to Lafayette to meet with Mr. Thibodaux. Petitioner's activities during his last two trips to Louisiana in 2004 focused primarily on his young horses. In November he met with the trainers at the Folsom Training Center to discuss the progress of his yearlings and two-year-olds, and he did so again in December before he attended Champions Day and then drove to Sebastien Farms to meet with Mr. Sebastien about the upcoming breeding season.

Deficiency Determination

Petitioner reported the results of the thoroughbred activity on Schedules C, Profit or Loss From Business, that he attached to his returns for the years at issue. He claimed deductions each year for advertising, board and care, mortality insurance, nomination and registration fees, veterinary expenses, and travel. For 2003 and 2004 he deducted training expenses in addition to the board and care

---

[21]As the thoroughbred activity progressed petitioner became active in the LTBA. In addition to Champions Day, he began attending other LTBA meetings and events. He also maintained consistent contact with Mr. Early, both on the phone and in person, speaking with him both about LTBA matters and promoting Choosing Choice.

[*25] expenses. Petitioner claimed losses from the thoroughbred activity for all of the years at issue, which respondent disallowed in a notice of deficiency, determining that the claimed losses were passive activity losses. Petitioner timely petitioned for redetermination.

Respondent's disallowance is based solely on section 469. Accordingly, we deem respondent to have conceded that petitioner operated the thoroughbred activity with a profit motive, see sec. 183, that the expenses for which he claimed deductions were ordinary and necessary, see sec. 162, and that he maintained records adequate to substantiate the deductions.

## OPINION

Section 469(a) disallows the passive activity loss of an individual taxpayer.[22] A "passive activity" is, generally speaking, the conduct of any trade or business in which the taxpayer does not "materially participate". Sec. 469(c)(1). A "passive activity loss" is the amount by which the aggregate losses from all passive activities for the taxable year exceed the aggregate income from all passive activities for such year. Sec. 469(d)(1).

---

[22]Passive activity losses are suspended until the taxpayer either has offsetting passive income or disposes of the taxpayer's entire interest in the passive activity. Sec. 469(b), (g).

**[\*26]** In general, a taxpayer is treated as materially participating in a trade or business if the taxpayer is involved in the operations of the trade or business on a regular, continuous, and substantial basis. Sec. 469(h)(1). Congress authorized the Secretary to prescribe regulations which specify what constitutes "material participation", see sec. 469(l)(1), and the Secretary promulgated seven regulatory tests in section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988). Relevant to this case, a taxpayer can meet the material participation requirement in a given year by satisfying any one of the following tests:

> (1) The individual participates in the activity for more than 500 hours during such year;

> \*         \*         \*         \*         \*         \*

> (3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

> \*         \*         \*         \*         \*         \*

> (7) Based on all of the facts and circumstances \* \* \* the individual participates in the activity on a regular, continuous, and substantial basis during such year.

[*27] Sec. 1.469-5T(a), Temporary Income Tax Regs., supra. Material participation of a taxpayer in an activity is determined separately for each taxable year, see sec. 469(a), and the taxpayer generally has the burden of proving material participation,[23] Rule 142(a); see also Harrison v. Commissioner, T.C. Memo. 1996-509.

Generally, any work done by an individual in connection with an activity in which he owns an interest at the time the work is done is treated as "participation" of the individual in the activity. Sec. 1.469-5(f)(1), Income Tax Regs. However, work done by the individual in his capacity as an investor in the activity, such as studying and reviewing financial statements, is not treated as participation unless the individual is involved in the day-to-day management or operations of the activity. Sec. 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

The extent of an individual's participation in an activity may be established by any reasonable means. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra. Contemporaneous daily time reports or logs are not required. Id.

---

[23]Petitioner argues that he is entitled to a shift in the burden of proof pursuant to sec. 7491(a). However, our resolution of this case is based on the preponderance of the evidence rather than the allocation of the burden of proof, so we do not consider petitioner's claim. See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212.

**[*28]** Reasonable means include (but are not limited to) the identification of services performed over a period and the approximate number of hours spent performing such services during such period, using contemporaneous records or materials. Id. While the regulations permit taxpayers some latitude in establishing the extent of their participation in an activity, we have consistently held that they do not allow a postevent "ballpark guesstimate". See Goshorn v. Commissioner, T.C. Memo. 1993-578; see also Moss v. Commissioner, 135 T.C. 365, 369 (2010); Fowler v. Commissioner, T.C. Memo. 2002-223.

At trial petitioner introduced a narrative summary in which he describes the work he performed in connection with the thoroughbred activity and estimates the time he spent performing such work for each of the years at issue. He prepared the summary with the assistance of his attorney in preparation for trial, using telephone records, credit card invoices, and other contemporaneous materials. For each year petitioner claims time for the following work done in connection with the thoroughbred activity: preparing and distributing promotional materials; telephone conversations with his associates, advisors, and potential customers; business trips to Louisiana; registering his horses for State and national awards; reviewing and placing mortality insurance on Choosing Choice; reviewing and

[*29] paying bills; recordkeeping; and continuing education.[24] Cumulatively, petitioner contends that he participated in the thoroughbred activity for 891 hours in 2002, 862 hours in 2003, and 937.5 hours in 2004.

While the narrative summary is a postevent review of petitioner's claimed participation in the thoroughbred activity, the parties stipulated his performance of many of the activities described therein, and a significant amount of credible third-party witness testimony and objective evidence indicates that it is an accurate depiction of his thoroughbred activity during the years at issue. See Pohoski v. Commissioner, T.C. Memo. 1998-17; see also Assaf v. Commissioner, T.C. Memo. 2005-14; Harrison v. Commissioner, T.C. Memo. 1996-509; cf. Merino v.

---

[24]Petitioner also claims time each year for his purported work as a "bloodstock agent" at the Canterbury Park Racetrack in Shakopee, Minnesota. Canterbury Park is Minnesota's only racetrack. It is about a half-hour drive from Minneapolis where petitioner lived and worked. Petitioner testified that he became licensed as a bloodstock agent in Minnesota in 2002 and that he often visited Canterbury Park early in the morning during its racing season to converse with owners and trainers while the horses were being trained. While he testified that he would at times try to facilitate transactions between buyers and sellers of horses, he did not introduce proof of his licensure and does not claim that performing services as a bloodstock agent was the primary motivation for his trips to Canterbury Park. We do not doubt petitioner's testimony regarding the time he spent at Canterbury Park or his claim that he learned about racehorse injuries and training through his discussions with the owners and trainers. However, we will disregard the time he spent there for purposes of determining material participation because he failed to satisfactorily explain how his trips to Canterbury Park were connected to the thoroughbred activity, i.e., his effort to profit from breeding Choosing Choice.

[*30] Commissioner, T.C. Memo. 2013-167, at *8; Bailey v. Commissioner, T.C. Memo. 2001-296. Respondent primarily disputes the time petitioner claims he spent performing the activities described in his narrative summary, arguing that his estimates are unreliable because the summary was prepared solely for purposes of litigation and is based in large part on petitioner's "unreliable memory". Respondent further argues that a substantial amount of petitioner's work was undertaken in his capacity as an investor in the thoroughbred activity and thus does not qualify as participation. See sec. 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., supra.

On the basis of his estimates of his participation in the thoroughbred activity, petitioner asserts that he satisfies the requirements for material participation provided in subparagraphs (1), (3), and (7) of section 1.469-5T(a), Temporary Income Tax Regs., supra, for each of the years at issue. We limit our discussion to subparagraph (1) because, as explained below, we conclude that petitioner participated in the thoroughbred activity for more than 500 hours in each year.

Material Participation in 2002

We begin by making three observations regarding petitioner's operation of the thoroughbred activity which are undisputed by the parties and which guide our

[*31] analysis of petitioner's narrative summary and the supporting evidence. First, during the years at issue petitioner was eager to learn about and become personally involved in Louisiana thoroughbred breeding. Second, petitioner considered stallion promotion to be critically important to the success of the thoroughbred activity, and the third-party witness testimony convincingly establishes that his promotional efforts far surpassed the promotional efforts of a typical Louisiana stallion owner. Third, petitioner enjoyed the thoroughbred activity and was determined to make it successful; as a result he micromanaged the activity to an extent, continuously monitoring the condition and progress of his horses and seeking information from the individuals who cared for and trained them.

In his narrative summary petitioner provided the following breakdown of his thoroughbred activity for 2002:

| Activity | Hours claimed |
|---|---|
| Obtain and copy promotional materials | 7 |
| Prepare video of Choosing Choice | 6 |
| Obtain and review list of LTBA members | 9 |
| Design and place print ads | 7 |
| Prepare and send promotional breeding packages | 42 |

| | |
|---|---|
| [*32] Telephone conversations with business associates and breeders | 311 |
| Stallion and foal registrations and nominations | 6 |
| Review and place Stallion Insurance | 2 |
| Trips to Louisiana | 290 |
| Review and pay bills | 16 |
| Bookkeeping and recordkeeping | 6 |
| Reading publications regarding thoroughbred horses | 71 |
| Attending seminars | 25 |

We first address the telephone conversations. Given his distance from Louisiana, the telephone was petitioner's primary means of developing the thoroughbred activity and monitoring his horses. The 311 hours he claimed in the narrative summary consist primarily of calls he made to associates, advisers, and potential customers in Louisiana. Messrs. Sebastien, Thibodaux, and Early were the most frequent recipients of petitioner's telephone calls. Mr. Sebastien testified that petitioner called him twice daily in 2002 and estimated that he spoke on the phone with petitioner for approximately 120 hours in each of the years at issue, with about 100 of the hours each year being attributable to calls petitioner made to him from Minnesota. Mr. Thibodaux testified that he spoke by telephone with petitioner almost daily throughout the years at issue, and he estimated that he spent between 50 and 100 hours in such conversations annually. Mr. Early testified that

[*33] he frequently spoke on the phone with petitioner, for approximately 35 to 40 hours each year, and that the conversations were more frequent in 2002 because petitioner had many questions about the breeding incentive program. By all accounts these conversations were always related to the thoroughbred activity.

Petitioner used both the landline at his law office and his cell phone to make calls related to the thoroughbred activity. His cell phone records from April 23, 2003, through December 31, 2004, and his landline records from August 31, 2003, through December 16, 2004, were stipulated by the parties. Petitioner testified that he requested complete telephone records for 2002 through 2004 after respondent's examination of his returns for those years began, but his service providers no longer had the oldest of the requested records.

Consistent with the witness testimony, the phone records in evidence reveal that petitioner called Louisiana numbers multiple times daily. Petitioner testified that all such calls were related to the thoroughbred activity because he did not call anyone in Louisiana for any other purpose. Combined, the partial records for 2003 show that he made 1,950 long-distance calls to Louisiana numbers that lasted 173 hours (i.e., not including calls he made from his cell phone while in Louisiana). The nearly complete 2004 records show 2,755 long-distance calls to Louisiana lasting a combined 220 hours. The records do not show the origin of

**[*34]** any incoming calls; thus they are not helpful in establishing the extent of any calls he received from Louisiana numbers.

Petitioner contends that his thoroughbred activity was similar throughout the years at issue and therefore the volume and duration of calls shown by the records in evidence are representative of the earlier records he could not obtain. He argues that the records in evidence support the witnesses' recollections of their telephone conversations with him, which were consistent with his own recollection, and indicate the magnitude of his promotional calls. As additional proof of his promotional calls petitioner points to the copious amounts of contemporaneous notations next to the contact information of LTBA members in his copy of the 2002 Farm & Service Directory which was stipulated by the parties. He also observes that the phone records show he made calls to numbers in 51 cities and towns in all areas of Louisiana. Given that the phone records do not account for any thoroughbred calls that he received, and considering the testimonies of Messrs. Sebastien and Early that their phone conversations with him were more frequent in 2002, as well as various business calls he made to States other than Louisiana, petitioner argues that his estimate of 311 hours is reasonable, and indeed conservative.

[*35] In response to respondent's claim that his lack of phone records for 2002 renders his estimate an impermissible "guesstimate", petitioner counters that the evidence of his business calls dwarfs anything in the existing caselaw. He specifically addresses Pohoski v. Commissioner, T.C. Memo. 1998-17, a case where we considered whether married taxpayers living in California had materially participated in the rental of their two Hawaiian condominiums. A significant amount of the participation they claimed with respect to the rental of each condominium involved time Mr. Pohoski spent on the phone with travel agents and prospective tenants. The taxpayers did not introduce telephone records or any other contemporaneous evidence of the duration of these calls, relying instead on Mr. Pohoski's testimony. Nonetheless, we found that the taxpayers materially participated in the rental of their condominium on Maui (but not the condominium on Molokai). In doing so we found the taxpayers' estimate of Mr. Pohoski's phone calls to be reasonable on the basis of his testimony, their relative success in renting the Maui condo,[25] and the fact that they had entered into an atypical contract with an onsite management company in which they reserved to themselves the primary responsibility of renting the condo. Id.; see also Assaf v.

---

[25]The Maui condo was rented for 22 weeks during the year under consideration, with an average stay for a tenant of 6.5 days. Pohoski v. Commissioner, T.C. Memo. 1998-17.

**[*36]** Commissioner, T.C. Memo. 2005-14; Harrison v. Commissioner, T.C. Memo. 1996-509. Petitioner argues that if the means used to prove the extent of Mr. Pohoski's telephone calls related to the rental of the Maui condominium were reasonable under section 1.469-5T(f)(4), Temporary Income Tax Regs., supra, then certainly the means he used to estimate the extent of his 2002 phone calls was reasonable as well.

Respondent argues that petitioner's estimate should be discounted because it double counts time claimed elsewhere in the narrative summary, such as arranging for insurance or placing the print advertisements, and because it is "unreasonable" for petitioner to claim that every call he made to Louisiana was related to the thoroughbred activity. However, we found petitioner's testimony regarding his calls to Louisiana credible, and there is no evidence suggesting that he called Louisiana for purposes other than the thoroughbred activity. And while petitioner likely accounted for small amounts of telephone time elsewhere in his narrative summary, we do not think that diminishes the overall credibility of his estimate. Ultimately, in view of the evidence, an estimate of approximately 300 hours of phone conversations related to the thoroughbred activity is reasonable.

[*37] We turn next to petitioner's trips to Louisiana and the work he performed while there. The parties stipulated that petitioner traveled to Louisiana in 2002 over the following days:

| Arrived in Louisiana | Returned to Minnesota |
|----------------------|----------------------|
| Apr. 5 | Apr. 8 |
| May 31 | June 3 |
| Aug. 16 | Aug. 19 |
| Nov. 15 | Nov. 18 |
| Dec. 12 | Dec. 15 |

While petitioner spent time during each trip inspecting his horses and managing their care, most of his work was devoted to stallion promotion. His primary promotional activity involved driving to horse breeding farms and meeting with the owners and managers, whom he tried to interest in breeding their mares to Choosing Choice. At trial petitioner testified that he visited approximately 90 to 100 farms across the State for that purpose during the years at issue. He also promoted Choosing Choice to breeders during Champions Day and other LTBA events he attended and had discussions with his advisers about the breeders he should solicit. During 2002 petitioner's activities were generally confined to south central Louisiana. He usually stayed with the Sebastiens, and his meetings with Messrs. Sebastien and Thibodaux took place in Washington or nearby

[*38] Lafayette. With the exception of the trip in December when he stayed in New Orleans, petitioner's promotional visits were to farms near Sebastien Farms.

Petitioner testified that when he was in Louisiana regardless of where he stayed, he would rise early in the morning and set off for a full day of work related to the thoroughbred activity, which usually lasted well into the evening. The 290 hours of participation petitioner claims in his narrative summary consists of 12 hours of work for each day he was in Louisiana and 10 hours of air travel for each round trip flight. However, on brief petitioner reduced the time he claimed for each travel day by 5 hours, resulting in a revised estimate of 240 hours, because he was not always able to follow his preferred practice of arriving in Louisiana on a morning flight and returning to Minneapolis on an evening flight, and in those instances he was unable to work a full day.

Petitioner's description of his activities and work habits while in Louisiana is supported by third-party witness testimony. Mr. Sebastien testified that he met with petitioner during nearly all of petitioner's trips to Louisiana and that petitioner often stayed with the Sebastiens in Washington. Mr. Sebastien characterized petitioner's visits as "all horse business". He testified to his conversations with petitioner about the many farms petitioner visited, feedback he received from breeders with whom petitioner met, and petitioner's habit of rising

[*39] as early as 5 a.m. when he stayed with the Sebastiens to begin working. Mr. Early testified that he met with petitioner during more than half of petitioner's visits to Louisiana during the years at issue, most often at LTBA events. According to Mr. Early, Choosing Choice was "all [petitioner] ever wanted to talk about". He witnessed petitioner's distributing promotional materials to breeders and offering to perform nicking reports for their mares and he testified to sometimes giving petitioner directions to farms petitioner planned on visiting. Messrs. Sebastien and Early both denied seeing petitioner carry on any "social activities" during his visits to Louisiana other than an occasional meal or drink, and they stated that even then his conversations focused on promoting Choosing Choice.

Respondent contends that petitioner did not introduce sufficient evidence to prove the extent of his activities in Louisiana and that the time he claimed therefor should be severely discounted. Respondent observes that petitioner did not provide corroborating testimony from any of the breeders whose farms he visited and that his credit card records in evidence, which show charges at a number of grocery stores, pharmacies, and restaurants, demonstrate that he engaged in some activities that were unrelated to the thoroughbred activity. To that end, respondent refers us to Pohoski v. Commissioner, T.C. Memo. 1998-17, discussed supra. In

**[\*40]** that case we significantly discounted the 10.7 hours per day the taxpayer husband claimed to have spent performing maintenance on the taxpayers' Hawaiian condominiums during a two-week "working vacation" they took with their two children. In doing so we reasoned that the estimate did not allow sufficient time for meals, travel, or family leisure time, all of which we found to have "certainly occurred". Id.

Unlike respondent, we see dramatic differences (besides the destination) between petitioner's trips to Louisiana and the Pohoskis' two-week "working vacation" with their children in Hawaii. Most significantly, petitioner traveled alone and without a recreational purpose to his trips. We also fail to see how the credit card charges respondent identified are inconsistent with petitioner's claim of devoting long hours to the thoroughbred activity while in Louisiana. Although petitioner did not proffer testimony from his prospective or actual customers, he presented sufficient evidence, in addition to his own credible testimony, to prove the nature of his activities in Louisiana. We find Mr. Sebastien's testimony particularly persuasive with respect to 2002 because petitioner was a frequent guest of the Sebastiens during that year. The cell phone records in evidence are also consistent with the uncontested testimony regarding petitioner's in-State activities. They show that when petitioner was in Louisiana he was usually awake

[*41] early and using his phone; on many days the origin of his outgoing calls would change as the day progressed, indicating he was on the road for long periods of those days. Although there are no records in evidence for 2002, we find the later records supportive because of the similarity of petitioner's activities in Louisiana throughout the years at issue.

Ultimately, petitioner has shown by reasonable means that he devoted most of each full day he spent in Louisiana to the thoroughbred activity. However, his revised estimate of seven hours of work in Louisiana on each travel day (in addition to five hours of travel time) requires a further downward adjustment. The phone records in evidence show that petitioner was able to follow his preferred practice of arriving in Louisiana on a morning flight and departing in the late afternoon or evening on only about half of his trips, and on a number of travel days he was unable to spend any significant time working in Louisiana.[26]

---

[26]For example, petitioner arrived in Baton Rouge, Louisiana, around 10 a.m. on July 24, 2003, and departed from Baton Rouge after 4 p.m. on July 27. However, for his next trip he arrived in Baton Rouge after 6 p.m. on December 11, 2003, and departed from Baton Rouge around 8:30 a.m. on December 15.

[*42] Considering all the evidence, we find that an estimate of 150 to 180 hours of participation related to petitioner's trips to Louisiana in 2002 is reasonable.[27]

The remaining hours of participation petitioner needs to satisfy the "more than 500 hours" test of section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, are easily accounted for by his preparation and mailing of the promotional breeding packages (the voluminous contents of which were stipulated by the parties) and the miscellaneous administrative tasks he completed. See Harrison v. Commissioner, T.C. Memo. 1996-509.

Respondent nevertheless argues that a great deal of the work upon which petitioner relies to satisfy the "more than 500 hours" test should not qualify as participation because petitioner performed it in his capacity as an investor in the thoroughbred activity. See sec. 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., supra. We reject this argument. Petitioner was directly involved in the day-to-day

---

[27]Respondent argues on brief that the time petitioner spent traveling to and from Louisiana should not be considered participation for purposes of sec. 469 because those flights represented petitioner's "commuting" between his personal residence and principal place of business. See Horton v. Commissioner, 86 T.C. 589, 593-594 (1986). However, respondent has conceded that petitioner's traveling expenses were ordinary and necessary under sec. 162 (and thus not commuting expenses). We fail to see how petitioner's flights could be considered ordinary and necessary business expenses under sec. 162 but not work done in connection with the thoroughbred activity under sec. 1.469-5(f)(1), Income Tax Regs. Considering that petitioner's air travel usually involved a connecting flight in Memphis or Houston, an estimate of five hours each way is reasonable.

**[\*43]** management and operations of the thoroughbred activity; therefore, any investor work he completed qualifies as participation for purposes of section 469. See sec. 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., supra; see also Assaf v. Commissioner, T.C. Memo. 2005-14. On the basis of his satisfaction of the more-than-500-hours test of section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, we conclude that petitioner was a material participant in the thoroughbred activity in 2002.

Material Participation in 2003

Overall, the manner in which petitioner operated the thoroughbred activity changed little from 2002 to 2003. When he was in Minnesota petitioner made multiple daily telephone calls relating to thoroughbred activity matters, prepared and mailed promotional materials, and completed various administrative tasks. During his trips to Louisiana he did promotional and managerial work similar to his activities the previous year. While promoting Choosing Choice remained the primary objective of his work, petitioner also devoted considerable time to planning for and monitoring the development of his yearlings.

Petitioner estimated that he spent 356 hours on long-distance telephone calls related to the thoroughbred activity in 2003. He based his estimate on over eight months of cell phone records and 4-1/2 months of records for his office landline,

[*44] which show he placed 1,950 long-distance calls to Louisiana numbers that lasted a combined 173 hours. As in 2002, most of these calls were to Messrs. Sebastien, Thibodaux, and Early and numerous breeders whom petitioner solicited to breed their mares to Choosing Choice. Petitioner also called various farms, trainers, and individuals in 2003 for purposes of deciding where to send his yearlings; and after his yearlings were moved, he frequently called the new facilities to monitor their progress and direct their care.[28] Considering the volume of the long-distance calls to Louisiana shown in the phone records, together with the witness testimony and other evidence, we believe that an estimate of approximately 325 to 350 hours of phone conversations related to the thoroughbred activity in 2003 is reasonable.

Petitioner made three trips to Louisiana in 2003, over the following days:

| Arrived in Louisiana | Returned to Minnesota |
|---|---|
| Mar. 21 | Mar. 25 |
| July 24 | July 27 |
| Dec. 11 | Dec. 15 |

---

[28]The owner of the farm in Doyline testified that petitioner called her three to four times a week during the four-month period she cared for one of petitioner's yearlings. Similarly, the owner of the Folsom Training Center testified that he spoke with petitioner by telephone every week to 10 days when petitioner's horses were in his care.

[*45] During each of these trips he did significant promotional and managerial work in south central Louisiana; however, his activities were not confined to that area as they generally were in 2002. Petitioner promoted Choosing Choice at farms in northwest Louisiana when he visited the farm in Doyline where one of his yearlings trained. Similarly, he made promotional visits to farms between New Orleans and Folsom when he was in the area to attend Champions Day and to view the progress of his yearlings at the Folsom Training Center. On brief petitioner estimated that he did 168 hours of work in connection with his three trips to Louisiana (30 hours less than he claimed in his narrative summary). Considering all the evidence, we find that an estimate of between 120 and 150 hours is reasonable.

Any remaining hours of participation petitioner needs to satisfy the more-than-500-hours test of section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, are again easily accounted for by his preparation and mailing of promotional breeding packages and the miscellaneous administrative tasks he completed. Accordingly, we conclude that petitioner was a material participant in the thoroughbred activity in 2003.

**[*46]** <u>Material Participation in 2004</u>

In 2004 petitioner's thoroughbred activity focused both on the promotion of his stallion and the development of his young horses, particularly the two-year-olds. Those horses reached racing age in the middle of 2004, and any early racing success they achieved was certain to be a boon to the thoroughbred activity. As in the two previous years, petitioner's primary activities involved his telephone conversations, for which he claimed 267 hours of participation, and his trips to Louisiana, for which he claimed 300 hours.

The nearly complete 2004 phone records in evidence show that petitioner made 2,755 long-distance telephone calls to Louisiana numbers that lasted 220 hours. Petitioner's estimate includes those calls as well as smaller amounts of time for thoroughbred activity calls he received and calls he placed to individuals in States other than Louisiana. Considering the phone records and the evidence of petitioner's telephone activity discussed previously, we conclude that an estimate of approximately 270 hours for 2004 is reasonable.

While petitioner spent somewhat less time on the telephone in 2004, he made six trips to Louisiana that year over the following days:

| [*47] Arrived in Louisiana | Returned to Minnesota |
|:---:|:---:|
| Feb. 26[1] | Mar. 1 |
| May 27 | May 30 |
| Aug. 12 | Aug. 15 |
| Oct. 2 | Oct. 5 |
| Nov. 24 | Nov. 26 |
| Dec. 8 | Dec. 12 |

[1]2004 was a leap year.

Because of the multiple and varying locations of his horses throughout 2004, petitioner's in-State travel was greater than in the previous years. He did promotional and managerial work in south central Louisiana during each of the six trips and in the New Orleans and Folsom areas during all but one trip (in October, when he spent most of his time in Shreveport for the yearling sale). In view of the testimonies of Messrs. Sebastien and Early regarding petitioner's work habits while in Louisiana and the information provided by the cell phone records, an estimate of 210 to 250 hours of participation related to petitioner's trips to Louisiana is reasonable.

As we found for the previous two years, any remaining hours of participation necessary for petitioner to prove material participation by satisfaction of the more-than-500-hours test are accounted for by his preparation and mailing

[*48] of promotional breeding packages and the miscellaneous administrative tasks he completed.  See sec. 1.469-5T(a)(1), Temporary Income Tax Regs., supra.

## Conclusion

The nature and extent of the activities described in petitioner's narrative summary are corroborated by phone records, third-party witness testimony, the parties' comprehensive stipulations of fact, and other contemporaneous materials. Cf. Bartlett v. Commissioner, T.C. Memo. 2013-182 (credible narrative summary not sufficient to establish material participation absent corroborating evidence such as phone records or other contemporaneous documentation of participation). On the basis of that evidence we are satisfied that petitioner performed more than 500 hours of qualifying "work done" in connection with the thoroughbred activity in each of 2002, 2003, and 2004; accordingly, he is treated as materially participating in the activity for each of those years.  See sec. 1.469-5(f)(1), Income Tax Regs.; sec. 1.469-5T(a)(1), (f), Temporary Income Tax Regs., supra.  Because he materially participated, the thoroughbred activity was not a passive activity and section 469 does not prohibit petitioner's deduction of the loss therefrom for any of the years at issue.  See sec. 469(a), (c)(1), (h)(1), (l)(1).

**[\*49]** We have considered all the remaining arguments for results contrary to those reached herein.  To the extent not discussed, we conclude those arguments are moot, without merit, or unnecessary to reach.

To reflect the parties' concessions on other issues.

<u>Decision will be entered</u>

<u>under Rule 155</u>.