T.C. Memo. 2015-59

UNITED STATES TAX COURT

JOSE A. LAMAS AND MARIA E. LAMAS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21999-12.                      Filed March 25, 2015.

<u>Jenny L. Johnson</u> and <u>Guinevere M. Moore</u>, for petitioners.

<u>W. Robert Abramitis</u>, <u>Tracey B. Leibowitz</u>, and <u>William Lee Blagg</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>: Petitioners, Jose A. and Maria E. Lamas, incurred
substantial losses in 2008 from two entities: Shoma Development Corp. and
Greens at Doral, LLC. They claimed those losses as a tentative carryback
adjustment to 2006, resulting in a tentative refund of $5,260,964. Respondent

[*2] determined that the 2008 losses were passive and that the Lamases were not entitled to the tentative carryback adjustment. Because we find that Mr. Lamas meets the material participation requirements, we conclude that these losses are not passive.

FINDINGS OF FACT

I.    Lamas Family Businesses

Jose Lamas, Sr., the father of petitioner Jose Antonio Lamas (Mr. Lamas), is a successful businessman who started Aljoma Lumber, Inc. in 1979. Aljoma was named after the elder Mr. Lamas' three children: Alejandra Lamas, Jose Antonio Lamas, and Maria Lamas Shojaee. Aljoma's headquarters were in south Florida, and the company manufactured, treated, and distributed lumber to wholesalers throughout Florida.

Mr. Lamas served as CEO of Aljoma from at least 1997, and the company flourished under his direction. Aljoma succeeded, grew substantially, and was sold in 2007.

The elder Mr. Lamas helped fund three businesses for his children: Continental Trust Mortgage Corp., Adrimar Investments Corp., and Shoma Development Corp. He structured each business with one child as the majority

**[*3]** owner holding 60% of the shares and the other two children each holding 20%.[1] Alejandra Lamas and her husband, Carlos Villenueva, owned 60% of Continental, and Mr. Lamas and Maria Lamas Shojaee each owned 20%. Mr. Lamas owned 60% of Adrimar, and Alejandra Lamas and Maria Lamas Shojaee each owned 20%. Maria Lamas Shojaee and her husband, Masoud Shojaee, collectively owned 60% of Shoma,[2] and Mr. Lamas and Alejandra Lamas each owned (directly or indirectly) 20%.

Continental, Adrimar, Shoma, and Aljoma were all related in some way to the business of real estate and tangentially to each other. Continental provided mortgages for many south Florida homes, some of which were built by Shoma. Adrimar invested in a payroll service business that did work for Continental and Shoma, and in other real estate projects. Aljoma sold lumber to wholesalers, who in turn sold that lumber to contractors, who built homes for Shoma.

In 2004 Shoma formed Greens at Doral, LLC, a condominium conversion project. Shoma and Greens were closely intertwined. Greens had the same ownership structure as Shoma and consolidated its financial information with

---

[1]Alejandra Lamas and Maria Lamas Shojaee each owned 40% jointly with their husbands and 20% of the shares alone.

[2]Maria Lamas Shojaee directly or indirectly owned 20% of Shoma alone, and she and her husband, Masoud Shojaee, owned 40% of Shoma jointly.

[*4] Shoma's.[3]  Greens operated out of Shoma's offices using Shoma's employees, and the shareholders planned to liquidate Greens after the conversion project was completed.  Shoma was a subchapter S corporation, and Greens was treated as a partnership for tax purposes.

II.     Mr. Lamas' Work for Shoma and Greens

Mr. Lamas owned 20% of Shoma and Greens and served on Shoma's board of directors.  Throughout 2008 he worked on behalf of Shoma and Greens to restore corporate assets to Shoma and to find additional investors for Shoma's projects to fill Shoma's capital needs.

A.      Work Restoring Shoma's Corporate Assets

Mr. Shojaee, while acting as president of Shoma and Greens, had used Shoma's assets for personal gain and usurped Shoma's business opportunities for another business he controlled.  Mr. Shojaee used Shoma to guarantee loans for Masmar, a business that he and his wife owned separately from her family.

Mr. Shojaee made a personal pledge to the University of Miami for $1.5 million, and in exchange for this donation the university was going to name a

---

[3]Masoud Shojaee owned 40% of Greens, and Maria Lamas Shojaee, Alejandra Lamas, and Mr. Lamas each owned (directly or indirectly) 20%.

[*5] facility after Mr. Shojaee. Instead of making this contribution from his personal funds, Mr. Shojaee caused Shoma to donate $1.5 million on his behalf.

Finally, Mr. Shojaee took a business opportunity away from Shoma when he chose to build a real estate project on Shoma land using one of his personally owned companies.

In early 2008 Mr. Lamas, along with his sister Alejandra Lamas initiated a derivative lawsuit on behalf of Shoma against Mr. Shojaee. They hired attorney Juan Pablo Cappello to pursue this derivative action. Mr. Lamas spent many hours discussing this matter with counsel and with adviser David Flinn, a longtime Lamas family adviser.

Mr. Lamas and his sister eventually settled with Mr. Shojaee on April 17, 2008, after extensive negotiations. Among other things, the settlement provided that Shoma guaranties for the benefit of Mr. Shojaee would be released and that Greens would make a distribution to its shareholders. Mr. Lamas sought repayment from Mr. Shojaee of the money Shoma pledged to the University of Miami. What was to be Shojaee Hall was instead named Shoma Hall as a result of

[*6] Mr. Lamas' effort to preserve Shoma's assets. We find that Mr. Lamas spent approximately 112.5 hours in 2008 acting on Shoma's behalf on this matter.[4]

B.      Shoma's Major Projects and Cashflow Needs

During the economic turmoil of 2008 Shoma was in dire need of more capital. Shoma had four major ongoing projects that required additional cash infusions: Fontainbleau Lakes, Bellagio, Park Square, and Alkymia. Three of the four projects were in south Florida, and Alkymia was in Las Vegas, Nevada. Shoma also needed more money to make loan payments on these four major projects, and its lenders demanded proof that Shoma could continue to comply with the loan covenants.

Fontainbleau Lakes was a 272-acre mixed-use commercial and residential project in Miami, Florida. As zoned in 2008, it had a value of approximately $65 million with outstanding debt of $68 million. As Mr. Flinn accurately described it at trial, it was "under water".

Shoma's second major project, Bellagio, was a 73-acre residential project in Hialeah, Florida. Shoma had borrowed $27,029,220 on this project, and the loan

---

[4]We find that Mr. Lamas spent 7.5 hours per week for 15 weeks before the April settlement was reached. In addition to testimony at trial, these amounts of time were corroborated by phone records showing many conversations that he had with Mr. Cappello.

**[*7]** matured on November 30, 2008.  Bellagio's loan-to-value ratio was almost 1-to-1 because Bellagio had recently been appraised at just $27,550,000.

Park Square, Shoma's third major project, was a 48-acre mixed-use commercial and residential project in Doral, Florida.  Shoma had borrowed $24,860,000 for Park Square, and this loan matured in January 2009.  The property had been appraised at $65 million in late 2007.

Shoma's fourth major project, Alkymia, in Las Vegas, was a 42-acre site between Las Vegas Boulevard and McCarran International Airport.  Shoma hoped to renew a $69 million loan for Alkymia at the end of 2009, considering a February 2008 appraisal that valued Alkymia at $462 million.

C.    Work With David Flinn

Mr. Lamas worked extensively with David Flinn, a trusted business adviser of the elder Mr. Lamas.  Mr. Flinn started working as a consultant for the elder Mr. Lamas in 1976, and soon after, the elder Mr. Lamas became Mr. Flinn's sole client.  Mr. Flinn served as a director on the boards of Aljoma, Shoma, Continental, and Adrimar.  Mr. Lamas and Mr. Flinn initially worked together at Aljoma when Mr. Lamas served as CEO and Mr. Flinn served as CFO.

Mr. Lamas and Mr. Flinn had frequent meetings during 2008, including regular Friday lunches, to discuss Shoma business.  Using an estimate of 40 lunch

[*8] meetings in 2008 lasting 3 hours each, we find that Mr. Lamas spent 120 hours at these meetings working for Shoma. After the settlement was reached with Mr. Shojaee in April 2008, Mr. Flinn had extensive additional discussions each week with Mr. Lamas about the latest potential project investor or purchaser that Mr. Lamas was pursuing on behalf of Shoma. Using an estimate of two hours per week for 37 weeks following the April settlement, we find that Mr. Lamas spent 74 hours in 2008 in these discussions with Mr. Flinn.[5]

D.    Work To Identify Potential Project Investors and Purchasers

Mr. Lamas worked to find investors and purchasers for Shoma projects in an attempt to cure Shoma's capital deficit, using the contacts he had gained from his years as CEO of Aljoma.

Mr. Lamas spoke with Carlos Gadala-Maria on the phone and met with him in Miami and New York to discuss clients of Mr. Gadala-Maria who might be possible referrals for Shoma. Mr. Gadala-Maria is the president of a securities broker-dealer, and his clients are mainly high net worth individuals. These activities totaled 13 hours in 2008.

---

[5]The Lamases corroborated much of this time through phone records showing calls from Mr. Lamas' cell phone to Mr. Flinn during 2008.

**[*9]**   Mr. Lamas spoke with Jesus Iglesias to identify potential investors or purchasers for Shoma projects. Mr. Iglesias owns Matcon Trading Corp., a business that operates in the petroleum industry and supplies raw materials for road construction, roofing, and other construction-related materials. Matcon operates in multiple markets, including the United States, Central America, South America, and Africa. Mr. Lamas had met Mr. Iglesias at least 10 years earlier when another Iglesias business, Anchor Matcon LLC, purchased lumber from Aljoma. Mr. Lamas spoke with Mr. Iglesias on many occasions looking for sources of capital for Shoma projects, and phone records show that these conversations lasted a total of 25 hours in 2008.

Mr. Lamas also spoke with Martin Javier Araujo, a person well connected to Mexican money sources, in an effort to find new capital for Shoma projects. Their conversations included negotiating Mr. Araujo's commission on any deals that came from sources that he had referred to Shoma. Mr. Lamas spoke with Mr. Araujo on the phone and in person for approximately 14 hours in 2008.

> E.   Work Promoting Shoma Projects to Potential Investors and Purchasers

Mr. Lamas and Mr. Flinn sometimes worked in tandem to attract potential investors and purchasers. After Mr. Lamas would make the initial pitch, Mr. Flinn

[*10] would have the followup conversations. Mr. Lamas teamed with Mr. Flinn on these discussions with a senior executive of Lennar Corp., Venezuelan investors, Alex Penelas (a referral source), and the head of a brokerage firm. Using an estimate of 3 hours per week for 37 weeks after the April settlement, we find that Mr. Lamas spent 111 hours in 2008 in tandem with Mr. Flinn promoting Shoma's projects to potential investors.

Mr. Lamas worked extensively negotiating with Florida Value Partners on Shoma's Fontainbleau Lakes project. Florida Value Partners specialized in acquiring distressed real estate and was a referral from Mr. Penelas. Florida Value Partners subsequently negotiated for the purchase of Fontainbleau Lakes over the course of several weeks. Although the deal ultimately fell through, we find that Mr. Lamas spent 36 hours, 3 hours per day for 12 days, in 2008 on this specific negotiation with Florida Value Partners.

Mr. Lamas also explored a joint Penelas-Shoma bid for a Doral City Hall construction project. Mr. Lamas spoke with both Mr. Penelas and Mr. Shojaee on the phone and in person about this project. We find that Mr. Lamas' joint bid discussions with Mr. Penelas lasted approximately 6.5 hours in 2008.

Mr. Lamas traveled to Las Vegas and met with potential project investors introduced by Mr. Gadala-Maria. Mr. Lamas dined with these potential investors

[*11] on five occasions. Allowing time for travel, preparation, and the five meetings, we find that Mr. Lamas spent 23 hours on this Las Vegas trip in 2008.[6]

Jose Garcia was the comptroller at Aljoma when Mr. Lamas was CEO, and Mr. Garcia continued working for Aljoma after it was sold to Universal Forest Products. Mr. Lamas approached Mr. Garcia about the possibility of Universal's buying Shoma's Fontainbleau Lakes project for $30 million to $35 million. We find that Mr. Lamas spent five hours in 2008 pursuing this potential deal.

In early 2008 Mr. Iglesias introduced Mr. Lamas to Dr. D'Stefano, who was interested in purchasing a building that Shoma owned in Miami. Mr. Lamas called Dr. D'Stefano and Mr. Iglesias about this purchase, and we find that these conference calls lasted two hours. Additionally, Mr. Lamas met with Dr. D'Stefano, and we find that in total he spent 10 hours preparing for and meeting with Dr. D'Stefano.

In the spring of 2008 Mr. Iglesias introduced Mr. Lamas to Henry Yurman, Hugo Yurman, and Mauro Yurman, who were brothers in a wealthy Venezuelan family. In addition to speaking with the Yurman brothers on the phone, Mr. Lamas met with them and some of their employees on two occasions to discuss

_____

[6]This 23-hour estimate is based on travel time to and from Las Vegas of 10 hours; three dinner meetings at 3 hours each; one lunch meeting at 2 hours; and 2 hours of time preparing for these meetings.

[*12] investing in Shoma's projects. Further, Mr. Iglesias, Mr. Lamas, and Mr. Shojaee separately met at Mr. Lamas' home and at another location where they discussed the payment terms of the Yurman brothers' potential investment. In total we find that Mr. Lamas spent at least nine hours in 2008 promoting Shoma's projects to the Yurman brothers.

In the summer of 2008 Mr. Iglesias introduced Mr. Lamas to a Venezuelan petroleum group that was interested in purchasing Shoma's Las Vegas property. We find that Mr. Lamas spent at least two hours discussing this potential purchase with the group.

Finally, Mr. Lamas lobbied both Mr. Iglesias and Roberto Blanco to personally invest in some of Shoma's projects in south Florida. We find that he spent at least two hours in 2008 in aggregate discussing these possibilities with Mr. Iglesias and Mr. Blanco.

F.    Work at Shoma Headquarters

In the latter half of 2008 the board of directors of Shoma named Mr. Lamas treasurer, made him an employee, and gave him an office at the company

[*13] headquarters.  We find that he spent 126 hours working onsite at Shoma's offices during 2008.[7]

We find that Mr. Lamas worked at least 691 total hours for Shoma and Greens during 2008.

III.    Mr. Lamas' Work for Bella Vista

Outside of his work for Shoma, Mr. Lamas participated in other real estate work activities in 2008.  The Bella Vista project was a condominium conversion that was initially operated through Bella Vista at Miami, LLC, which was owned by Recaredo Gutierrez.  Through a company called Bella Vista Capital Partners, LLC, Mr. Lamas initially provided mezzanine financing to the Bella Vista project.[8]

In May 2008 Mr. Gutierrez declared bankruptcy, and Mr. Lamas took over the Bella Vista project in an effort to salvage his investment.  Mr. Lamas hired attorney Alfredo Perez to represent his interest in Mr. Gutierrez's bankruptcy case.

---

[7]This estimate of 126 hours is based on the following breakdown of hours: for the weeks of October 5, 12, and 19--five days per week for three hours per day; for the weeks of October 26 and November 2 and 9--four days per week for three hours per day; and for the weeks of November 16, 23, and 30 and December 7 and 14--three days per week for three hours per day.  This estimate is based on testimony of respondent's witness Francisco Silva discussed below.

[8]Mr. Lamas invested in Bella Vista Capital through Adrimar.

[*14] In addition, Mr. Lamas, along with Mr. Penelas and Mr. Blanco, formed Bella Vista Holdings, LLC to take over the Bella Vista project from Mr. Gutierrez. Including the time Mr. Lamas spent talking with Mr. Perez, Mr. Penelas, and Mr. Blanco on the phone and the time he spent negotiating the takeover, we find that he worked a total of 44 hours in 2008 on this phase of the Bella Vista project.[9]

Mr. Lamas assumed a management role after taking over the Bella Vista project. He negotiated with plumbers and electricians who had worked on the project, and he took over tenant management, including tenant eviction. He also dealt with the City of Miami on the project's existing code violations. We find that he spent at least 5 hours per week for 30 weeks, totaling 150 hours in 2008, in management for the Bella Vista project.

After Mr. Lamas took over the project he was responsible for the day-to-day finances, and he arranged for essential project loans. He initially negotiated a discount on the existing note with the primary mortgage holder; then he arranged for a different bank to pay off that note. He also prepared the company budgets for this project. We find that he spent 40 hours negotiating with the banks and 60

---

[9]Specifically, phone records show that Mr. Lamas spoke with Mr. Perez 26.3 hours, Mr. Blanco 8.5 hours, and Mr. Penelas 1.8 hours. We find that Mr. Lamas spent at least 10 hours in negotiation for the project, for a total of 44.3 hours.

[*15] hours managing the finances for this project for a total of 100 hours of work in 2008 on the financial aspects of the Bella Vista project.

We find that Mr. Lamas worked at least 294 total hours for the Bella Vista project during 2008.

IV.   IRS Audit

The Internal Revenue Service (IRS) began an audit of the Lamases' 2006 and 2008 returns ultimately resulting in the IRS' determining no deficiency for 2008 and a deficiency for 2006 that was solely attributable to carrybacks from 2008. The Lamases cooperated with IRS requests throughout the process, including requests for witnesses, meetings, and interviews. The Lamases also responded to the two information document requests respondent issued on September 29 and November 5, 2009. Respondent alleged that the Lamases failed to cooperate with the requests, yet respondent stipulated that respondent never notified the Lamases of this alleged failure.

During the audit, Mr. Shojaee made inconsistent statements to the IRS about Mr. Lamas' work for Shoma. On October 23, 2009, Mr. Shojaee initially

[*16] represented in a notarized statement to the IRS that Mr. Lamas "regularly and continuously works on behalf of the company (on average spending well in excess of 10 hours per week), including for the calendar year 2008 (and 2009 year-to-date)."

In a later response to an IRS request for the specific hours that Mr. Lamas worked for 2008, Mr. Shojaee asserted on March 16, 2010, that "Shoma Development is a family owned company which does not create or maintain a record of the specific work activities, or the specific hours worked, by any Shareholder, Officer or Director."

Finally, after a dispute arose between Mr. Shojaee, Mr. Lamas, and Alejandra Lamas over actions taken by Mr. Shojaee, Mr. Shojaee submitted a third and different story to the IRS in a letter. In this letter, dated September 27, 2010, Mr. Shojaee wrote that "Recently, Shoma Development learned that the IRS requires active participation and 500 hours of work to qualify" and that Mr. Lamas did not perform any significant work for Shoma or Greens. Mr. Shojaee also stated that "Jose Antonio Lamas had no direct nor indirect involvement with Shoma."

In the same timeframe in which this September 27, 2010, letter was sent to the IRS, Mr. Shojaee needed Mr. Lamas' and Alejandra Lamas' approval on a

**[*17]** joint venture and their waiver of a potential conflict of interest for Shoma's Fontainbleau Lakes project. Without Mr. Lamas' and Alejandra Lamas' waiver, Fontainbleau Lakes would go into foreclosure. The lenders wanted all the shareholders to be in agreement, and time was of the essence. A foreclosure of Fontainbleau Lakes could have negatively affected other Shoma projects, especially when added to the fact that Shoma's Alkymia project in Las Vegas was in foreclosure.

Mr. Shojaee threatened that if Mr. Lamas and Alejandra Lamas did not accede to Mr. Shojaee's demands, he would sue them for fraud, breach of fiduciary duty, and tortious interference with business relationships. In a letter dated September 16, 2010, sent through counsel, Mr. Shojaee elaborated on his litigation threats, vowing to sue them for breaching their fiduciary duty as directors of Shoma by refusing to approve the Fontainbleau Lakes restructuring.

Mr. Lamas and Alejandra Lamas believed that Mr. Shojaee was not honoring the April 17, 2008, settlement and ultimately refused to approve Mr. Shojaee's plan. Once it become apparent to Mr. Shojaee that they refused to approve his plan and refused his buyout offers, he wrote the third contradictory letter to the IRS, dated September 27, 2010, almost a year after his original

[*18] statement to the IRS, newly asserting that Mr. Lamas did not materially participate in Shoma.

Mr. Shojaee subsequently faxed a letter to the IRS on March 31, 2011, which states: "In reference to our letter dated September 27, 2010, we kindly request that this letter be treated privately."

The IRS issued a notice of deficiency for 2006 for a tax deficiency of $4,911,669. This deficiency related to the IRS' recharacterizing the Lamases' 2008 net operating losses (NOL) from Shoma and Greens as passive instead of nonpassive. The Lamases had claimed those losses as a tentative carryback adjustment to 2006 and received a tentative refund for that year.[10] Accordingly, the IRS issued the notice of deficiency for 2006, with the deficiency relating to losses arising in 2008 and carried back. In this notice the IRS made the following adjustments: reduced the NOL allowed for 2006; denied deductions for certain expenses reported on Schedule C, Profit or Loss From Business, and Schedule E, Supplemental Income and Loss, for 2008; increased income, dividends, and interest for 2008; increased certain losses from sales of business property for 2008; increased itemized deductions for 2008; and made other computational adjustments.

---

[10]See generally I.R.C. sec. 6411.

[*19] V.     Trial Proceedings

The Lamases resided in Florida when they timely petitioned the Court.

A.     Testimony From Petitioners' Witnesses

At trial petitioners called 10 witnesses and submitted stipulated testimony from two more witnesses; these witnesses credibly testified about Mr. Lamas' significant efforts working for Shoma, Greens, Bella Vista, and another project, Gables, during 2008.  In addition to these witnesses' testimony, the Lamases produced phone records that further corroborate Mr. Lamas' participation.

1.     David Flinn

Mr. Flinn served as a board member of Shoma and was intimately involved with Shoma's business during 2008.  He testified that Mr. Lamas did significant work for Shoma during 2008 including restoring Shoma's corporate assets, networking to identify potential investors for Shoma projects, and pursuing these potential leads.  He met frequently with Mr. Lamas to discuss Shoma business and also assisted Mr. Lamas in pursuing potential Shoma project investors.

2.     Alex Penelas

Mr. Penelas was a former Miami-Dade County mayor who worked with Mr. Lamas in multiple activities and testified he found it "more effective" to talk with Mr. Lamas than Mr. Shojaee.  He further testified that he introduced Mr. Lamas to

[*20] Florida Value Partners and other potential investors for Shoma projects, pursued a joint Shoma-Penelas bid for a construction project, and owned the Bella Vista project with Mr. Lamas.

### 3. Roberto Blanco

Mr. Blanco is a joint owner of the Bella Vista project with Mr. Lamas and Mr. Penelas. He testified that Mr. Lamas worked to obtain new project financing and completed necessary financial functions for the project.

### 4. Jose Garcia

Mr. Garcia was the comptroller for Aljoma and continued to work for Aljoma after it was sold to Universal. He testified that Mr. Lamas was in negotiations with Universal to buy Shoma's Fontainbleau Lakes project.

### 5. Carlos Gadala-Maria

Mr. Gadala-Maria introduced Mr. Lamas to many potential investors for Shoma projects. He testified that Mr. Lamas had multiple meetings at his offices for this purpose, and also traveled to Las Vegas to pursue potential leads.

### 6. Maria Lamas

Maria Elena Lamas is the wife of Mr. Lamas and a petitioner in this case. She testified that her husband worked constantly, frequently discussed Shoma

[*21] business on the phone and at dinners with Mr. and Mrs. Shojaee, and traveled to meet with potential investors for Shoma projects.

### 7. Jesus Iglesias

Mr. Iglesias owns a corporation that does business in multiple markets around the world. He testified that he referred investors for Shoma projects to Mr. Lamas and that Mr. Lamas met with Dr. D'Stefano, the Yurman brothers, and a Venezuelan petroleum group regarding possible investments. Further, Mr. Iglesias testified that he discussed with Mr. Lamas the possibility of his personally investing in Shoma projects.

### 8. Martin Javier Araujo

Mr. Araujo was well connected to Mexican money sources who were prospective investors for Shoma projects. He testified that he and Mr. Lamas spoke on the phone and in person in an effort to identify potential Shoma project investors and also negotiated Mr. Araujo's commission for any sales of Shoma projects in which he was involved.

### 9. Armando Talavera

Mr. Talavera worked for Mr. Lamas as the project manager on the Gables project. The Gables project was on one floor of a building in Coral Gables, Florida, where floor space was converted into six separate offices. Mr. Lamas

[*22] managed Gables Holdings, LLC, the company formed to oversee the Gables project, from its inception. Mr. Talavera testified that Mr. Lamas frequently visited the jobsite, made all the important decisions for the project, revised the plans because of issues with the homeowners' association, and marketed the project to potential tenants. The Lamases argued that Gables is a significant participation activity,[11] but we find that their estimates for Mr. Lamas' site visits were too high and consequently his total participation in Gables was less than 100 hours.

### 10. Maria Perez-Abreu

Ms. Perez-Abreu is a certified public accountant and serves as Shoma's tax consultant. Ms. Perez-Abreu testified that she provided payroll documents showing that Mr. Lamas was a Shoma employee and that she gave the September 2009 statement to Mr. Shojaee to sign; it stated that Mr. Lamas "regularly and continuously works on behalf of the company (on average spending well in excess of 10 hours per week), including for the calendar year 2008 (and 2009 year-to-date)."

---

[11]Sec. 1.469-5T(a)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

**[*23]**     11.     <u>Allison Shipley</u>

Ms. Shipley works as a principal at PricewaterhouseCoopers. She prepared tax returns for the Lamases for the years in issue and assisted them during the IRS audit of their returns. Ms. Shipley testified that she compiled records and responded to IRS inquiries to show that Mr. Lamas materially participated in Shoma. She further testified that no one from Shoma ever told her there was any problem with Mr. Shojaee's signing a statement that Mr. Lamas "regularly and continuously works on behalf of company (on average spending well in excess of 10 hours per week), including for the calendar year 2008 (and 2009 year-to-date)."

12.     <u>Sol Elena Rodriguez</u>

Ms. Rodriguez served as Shoma's human resources manager during much of 2008. She testified that Mr. Lamas became a Shoma employee in October 2008, that she entered Mr. Lamas into Shoma's payroll system, and that Mr. Lamas was given an office at Shoma's headquarters.

B.     <u>Testimony From Respondent's Witnesses</u>

At trial respondent called four witnesses, only one of whom contradicted the Lamases' witnesses.

**[*24]**      1.      Thomas Valido

Mr. Valido was the IRS agent who conducted the audit of the Lamases' returns for the years in issue. Mr. Valido testified that the Lamases produced documents in response to the information document requests that he had sent and that he met with their representatives multiple times during the audit. Overall, we find that Mr. Valido's testimony did not contradict the numerous witnesses for the Lamases who gave detailed examples of Mr. Lamas's significant efforts for Shoma and Greens, and Bella Vista.

2.      Tania Martin

Ms. Martin has worked for Shoma for more than 20 years and was CFO during the years in issue. Although Ms. Martin testified that she did not recall seeing Mr. Lamas at Shoma's offices except "maybe one time", she explained on cross-examination that she worked remotely from home in North Carolina much of the time. Ms. Martin corroborated the Lamases' claim that Shoma projects needed additional investors to provide adequate cashflow during 2008 to continue servicing its loans.

Overall, Ms. Martin's testimony did not contradict the testimony of petitioners' witnesses. Moreover, Ms. Martin's testimony corroborated Shoma's need for investors in its projects during 2008.

**[*25]**     3.     <u>Francisco Silva</u>

Mr. Silva is in-house counsel for Shoma and has served in this capacity since 2006. Mr. Silva did not shed light on what Mr. Lamas actually did or did not do at Shoma but mainly testified about the frequency with which he saw Mr. Lamas and Alejandra Lamas at Shoma:

> He would stop by, he would walk past my office in the morning, he would say good morning, he'd go to his office, he would sit there. When I would walk by the office, sometimes they were there, sometimes they were not, in the morning. In the afternoon, I don't remember seeing them. And I don't know what, if anything, he was doing. I just don't know.

Mr. Silva testified that there was a conference call on either March 15 or 16, 2010, where Mr. Shojaee called Allison Shipley on the phone while Mr. Silva and Mr. Lamas were present, and Mr. Shojaee told everyone that his September 2009 affidavit to the IRS regarding Mr. Lamas's participation in Shoma was wrong. Although Mr. Silva recounted this conversation, he did not take a position of his own about how much time Mr. Lamas worked for Shoma.

     4.     <u>Masoud Shojaee</u>

Mr. Shojaee is the brother-in-law of Mr. Lamas and the president of Shoma and Greens. He asserted that Mr. Lamas did nothing for Shoma during 2008. He

**[\*26]** said that he "glanced at", "misread", and "overlooked" the affidavit he signed in September 2009 that showed Mr. Lamas materially participated in Shoma.

Like Mr. Silva, Mr. Shojaee said that there was a conference call with Ms. Shipley on the line, and Mr. Silva and Mr. Lamas in his office on March 16, 2010, when he told Ms. Shipley that his September 2009 affidavit was wrong.

## OPINION

The sole issue we must decide is whether Mr. Lamas materially participated in Shoma and Greens during 2008. If he did, then the net losses from Shoma and Greens would not be subject to the passive loss limitation of section 469.[12] Other issues raised in the notice of deficiency and not addressed in the stipulations or by the Lamases at trial are deemed conceded.[13]

---

[12]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[13]See Rule 149(b).

**[\*27]** I.     <u>Burden of Proof</u>

The Commissioner's determinations in the notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving otherwise.[14]  A taxpayer is required to maintain sufficient records to "show whether or not such person is liable for tax".[15]  The burden may shift to the Commissioner under section 7491(a) if the taxpayer has complied with the necessary substantiation requirements and has maintained all records and cooperated with reasonable requests by the Commissioner regarding information and documents.

We find that the preponderance of the evidence supports the Lamases' claim that Mr. Lamas materially participated in Shoma and Greens for 2008; therefore we do not need to consider the Lamases' argument that the burden of proof should shift to respondent.[16]

II.     <u>Material Participation Requirements Under Section 469</u>

Section 469 prevents taxpayers from using passive losses to offset nonpassive income.  A passive activity is any trade or business in which the

---

[14]Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

[15]Sec. 6001.

[16]<u>See</u> <u>Blodgett v. Commissioner</u>, 394 F.3d 1030, 1039 (8th Cir. 2005) ("[A] shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie."), <u>aff'g</u> T.C. Memo. 2003-212.

[*28] taxpayer does not materially participate.[17] Taxpayers have a passive loss if their aggregate losses from their passive activities exceed their aggregate income from passive activities for a year.[18]

Generally, taxpayers materially participate if they are involved in the operations of the trade or business on a regular, continuous, and substantial basis.[19] The regulations provide seven tests to determine whether a taxpayer materially participated, and a taxpayer only needs to satisfy one of those tests.[20] We find that Mr. Lamas satisfies at least two of these seven tests.[21] Under one of those tests, taxpayers can satisfy the material participation requirement if they participate in the trade or business activity for more than 500 hours during the

---

[17]Sec. 469(c).

[18]Sec. 469(d)(1).

[19]Sec. 469(h)(1).

[20]Garnett v. Commissioner, 132 T.C. 368, 372 n.10 (2009); Montgomery v. Commissioner, T.C. Memo. 2013-151, at *8; Miller v. Commissioner, T.C. Memo. 2011-219, 2011 WL 4025492, at *5; sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).

[21]The Lamases argued that they satisfy other tests for material participation under sec. 1.469-5T(a), Temporary Income Tax Regs., supra, but we need not reach these arguments because Mr. Lamas' direct participation during 2008 satisfies the material participation requirements under sec. 1.469-5T(a)(1) or alternatively under sec. 1.469-5T(a)(4), Temporary Income Tax Regs., supra.

[*29] taxable year.[22]  Under the other, taxpayers can satisfy the material

participation requirement if "[t]he activity is a significant participation activity

* * * for the taxable year, and the * * * [taxpayers'] aggregate participation in all

significant participation activities during such year exceeds 500 hours".[23]

To establish the hours spent on an activity, taxpayers are not required to

keep "[c]ontemporaneous daily time reports, logs, or similar documents" to

substantiate their participation "if the extent of * * * [their] participation may be

established by other reasonable means."[24]  Generally "reasonable means" includes

"the identification of services performed over a period of time and the

approximate number of hours spent performing such services during such period,

based on appointment books, calendars, or narrative summaries."[25]  Taxpayers

cannot merely make a "ballpark guesstimate" of their participation.[26]

---

[22]Sec. 1.469-5T(a)(1), Temporary Income Tax Regs., <u>supra</u>.

[23]Sec. 1.469-5T(a)(4), Temporary Income Tax Regs., <u>supra</u>.

[24]Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., <u>supra</u>., 53 Fed. Reg. 5727 (Feb. 25, 1988).

[25]Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., <u>supra</u>.

[26]<u>Tolin v. Commissioner</u>, T.C. Memo. 2014-65, at *28 (citing <u>Goshorn v. Commissioner</u>, T.C. Memo. 1993-578, <u>Moss v. Commissioner</u>, 135 T.C. 365, 369, (2010), and <u>Fowler v. Commissioner</u>, T.C. Memo. 2002-223).

[*30] If a taxpayer owns an interest in a trade or business and works in connection with that activity, then this work generally qualifies as participation unless an exception applies.[27] There are two exceptions that are potentially relevant here: (1) work not customarily done by owners and (2) participation as an investor.[28] We will address these in the context of Shoma and Greens, and Bella Vista, entities in which Mr. Lamas participated.

III.    Whether Shoma and Greens Should Be Treated as a Single Activity Under the Appropriate Economic Unit Grouping Rules in Section 1.469-4(c), Income Tax Regs.

We first review whether it is appropriate to aggregate the hours Mr. Lamas worked for Shoma and Greens for 2008 and treat them as a single activity by looking to the relevant instructions in section 1.469-4(c), Income Tax Regs. This regulation sets forth five factors that are "given the greatest weight in determining whether activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469":

(i) Similarities and differences in types of trades or businesses;

(ii) The extent of common control;

---

[27]Sec. 1.469-5(f), Income Tax Regs.

[28]Sec. 1.469-5T(f)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

**[*31]**   (iii)  The extent of common ownership;

(iv)  Geographical location; and

(v)  Interdependencies between or among the activities (for example, the extent to which the activities purchase or sell goods between or among themselves, involve products or services that are normally provided together, have the same customers, have the same employees, or are accounted for with a single set of books and records).[29]

This regulation further instructs that taxpayers can "use any reasonable method of applying the relevant facts and circumstances" to group activities, and that not all of the five factors are "necessary for a taxpayer to treat more than more activity as a single activity".[30]  However, when evaluating Shoma and Greens using these factors, we find that they meet all five factors and therefore should be treated as a single activity.

Shoma and Greens are similar businesses; both are engaged in commercial and residential real estate development.

Shoma and Greens shared common control and ownership for the years in issue.  Mr. and Mrs. Shojaee collectively owned 60%, and Alejandra Lamas and

---

[29]Sec. 1.469-4(c)(2), Income Tax Regs.

[30]Sec. 1.469-4(c)(2), Income Tax Regs.

**[*32]** Mr. Lamas each owned (directly or indirectly) 20% of both Shoma and Greens.[31]  Mr. Shojaee was president of both Shoma and Greens for the years in issue.

Shoma and Greens shared geographic locations; Greens operated out of Shoma offices.

Finally, Shoma and Greens were interdependent.  Greens operated out of Shoma offices, used Shoma employees, and consolidated its financial reporting with Shoma's.  Greens was formed by Shoma as a condominium conversion project.  The shareholders intended that Greens be dissolved after the project was completed and the capital returned to its shareholders.

Because Shoma and Greens meet these five factors, we find that they are an appropriate economic unit and should be grouped as a single activity.  Consequently, we find that Mr. Lamas' participation in Shoma qualifies as work for Greens.

---

[31]Mr. and Mrs. Shojaee owned 40% of Shoma, and Mrs. Shojaee, Mr. Lamas, and Alejandra Lamas directly or indirectly owned 20% of Shoma.  Likewise, Mr. Shojaee owned 40% of Greens, and Mrs. Shojaee, Mr. Lamas, and Alejandra Lamas directly or indirectly owned 20% of Greens.

[*33] IV.   Whether Mr. Lamas Participated for More Than 500 Hours in Shoma and Greens Under Section 1.469-5T(a)(1), Temporary Income Tax Regs.

In 2008 Mr. Lamas worked a significant amount of time for Shoma and Greens, and we find that he materially participated in this activity.

A.   Mr. Lamas Worked at Least 691 Hours for Shoma and Greens.

The Lamases presented credible testimony and phone records to show that Mr. Lamas worked at least 691 hours for Shoma and Greens during 2008. Witnesses testified that Mr. Lamas worked restoring corporate assets to Shoma and seeking potential investors for Shoma projects to meet Shoma's capital needs. The Lamases presented phone records that further corroborated witnesses' accounts. We find this evidence accurately reflects Mr. Lamas' work for Shoma.[32]

Indeed, the only testimony that cannot be reconciled is Mr. Shojaee's, but Mr. Shojaee's inconsistent statements and personal conflicts with Mr. Lamas call his credibility into question. In early 2008 Mr. Lamas undertook efforts to restore assets to Shoma, specifically, assets that had been depleted by Mr. Shojaee to the detriment of minority interest holders in Shoma, such as Mr. Lamas. Mr. Shojaee and Mr. Lamas, through their counsel, argued over the future of Shoma and

---

[32]See Tolin v. Commissioner, at *29 (citing Pohoski v. Commissioner, T.C. Memo. 1998-17, Al Assaf v. Commissioner, T.C. Memo. 2005-14, and Harrison v. Commissioner, T.C. Memo. 1996-509).

[*34] Greens and over Mr. Shojaee's use of Shoma for his personal benefit. Eventually a settlement agreement over the matter was executed by Mr. and Mrs. Shojaee, Mr. Lamas, and Alejandra Lamas in April 2008. After this settlement, Mr. Lamas became a director, officer, and employee of Shoma, as well as its treasurer. Then in 2009 the Lamases filed their income tax return for 2008, as well as an application for a tentative refund carrying back their 2008 losses to 2006. The IRS subsequently began an audit of their 2006 and 2008 returns. During the audit, in his notarized letter of October 23, 2009, Mr. Shojaee took the position that Mr. Lamas worked on behalf of Shoma "well in excess of" 520 hours in 2008. Later in 2010 Mr. Lamas and Alejandra Lamas were again in a dispute with Mr. Shojaee because he was not fulfilling his obligations to them under the April 2008 settlement agreement, among other things. After repeated settlement offers by Mr. Shojaee were rejected, and when many of Shoma's projects were in financial peril at a time when Mr. Lamas and Alejandra Lamas refused to give their consent to Mr. Shojaee's restructuring plans, Mr. Shojaee wrote the IRS and took a sudden, new, and contrary position regarding Mr. Lamas' work on behalf of Shoma,

[*35] stating that Mr. Lamas "had no direct or indirect involvement with Shoma" in 2008.[33]

This last statement by Mr. Shojaee is directly contradicted by contemporaneous documents and Mr. Shojaee himself. The Lamases produced Shoma corporate board meeting minutes and resolutions from 2008 naming Mr. Lamas as a director and treasurer of Shoma. They also produced a Form W-2, Wage and Tax Statement, and biweekly earnings statements issued by Shoma to Mr. Lamas for 2008 confirming he was an employee. And moreover, Mr. Shojaee's own testimony at trial is contradictory. Mr. Shojaee attempted to convey that Mr. Lamas was doing "nothing" for Shoma and that he had "zero" expectations for him. In direct conflict with his own testimony, Mr. Shojaee also stated that Mr. Lamas arranged a conference call to find investors for Shoma projects, and that he and Mr. Lamas were "talking terms" about real estate deals on phone calls in 2008.

These facts alone would be enough to discount Mr. Shojaee's testimony, but moreover, no witness corroborates Mr. Shojaee's current view that Mr. Lamas spent less than 500 hours working for Shoma and Greens in 2008. Others, such as

---

[33]Mr. Shojaee subsequently faxed a letter to the IRS on March 31, 2011, which states: "In reference to our letter dated September 27, 2010, we kindly request that this letter be treated privately."

[*36] Agent Valido, who audited the Lamases' returns, did not have any direct knowledge about Mr. Lamas' work for Shoma and Greens. Ms. Martin testified about her limited interaction with Mr. Lamas but freely admitted she was often absent from Shoma's offices because she worked remotely from home. The testimony that comes closest to corroborating Mr. Shojaee's testimony is that of Mr. Silva, but his testimony goes only so far. He testified that he saw Mr. Lamas in the office, but he offered no testimony about Mr. Lamas' efforts outside the office. Indeed, he was explicit in saying: "I don't know what, if anything he was doing. I just don't know."[34]

Although the maxim "falsus in uno, falsus in omnibus"[35] does not always apply, given Mr. Shojaee's evident bias and conflicting statements, coupled with the lack of corroborating testimony, it fits Mr. Shojaee's testimony. Accordingly, we give Mr. Shojaee's testimony no weight. And as previously noted, Mr. Shojaee is the only source of evidence that conflicts with the otherwise extensive evidence that Mr. Lamas materially participated in Shoma and Greens for more than 500 hours during 2008.

---

[34]Although Mr. Silva confirmed Mr. Shojaee's testimony about a conference call where Mr. Shojaee told Mr. Lamas that his affidavit was incorrect, Mr. Silva did not offer his own view on whether the affidavit was incorrect.

[35]False in one thing, false in all. Black's Law Dictionary 679 (9th ed. 2009).

**[\*37]** B.     The Participation as an Investor Exception Does Not Apply.

The investor exception prevents taxpayers from counting time they worked in their capacity as investors "unless the individual is directly involved in the day-to-day management or operations of the activity."[36]  Investor activity includes: "(1) Studying and reviewing financial statements or reports on operations of the activity; (2) Preparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use; and (3) Monitoring the finances or operations of the activity in a non-managerial capacity."[37]

Respondent argues that the time Mr. Lamas spent working for Shoma does not qualify as participation because he was merely working in an investor capacity; respondent claims that Mr. Lamas was not involved in the day-to-day management and operations.

The Lamases argue that Mr. Lamas was involved in the day-to-day management and operations of Shoma and that his work was similar to the taxpayer's activities in Tolin v. Commissioner.[38]  In that case, Mr. Tolin owned a

---

[36]Sec. 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988) (emphasis added).

[37]Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs, supra.

[38]T.C. Memo. 2014-65.

[*38] successful racing stallion that he bred with other horses for a fee, and he spent most of his time in this activity promoting his stallion. Mr. Tolin contacted potential clients by phone to solicit interest in his horse, networked at horse industry events such as charity functions, parties, and dinners, and traveled to meet with horse breeding farm owners and managers to interest them in breeding their mares with his stallion. Mr. Tolin also frequently called three industry veterans for advice on his horse breeding activities and for referrals to potential clients. He mailed promotional followup brochures and engaged in various activities such as paying bills and recordkeeping. We held that the investor exception did not apply because Mr. Tolin's promotional activities were a central part of his stallion breeding business and qualified as participation in the day-to-day management and operations. Accordingly, we held that all his hours, including those spent in investment activities, counted as participation in the activity.

Respondent mischaracterizes the Court's findings in Tolin by stating that the Court did not reach the issue of whether Mr. Tolin's promotional efforts such as talking with people over lunch in a social context amounted to day-to-day management and operations of Mr. Tolin's stallion breeding business. In fact, the Court found that Mr. Tolin's promotional efforts were a direct part of the day-to-day management and operations of his business. The core part of Mr. Tolin's

[*39] work was promotion. Indeed, Mr. Tolin's "primary goal during the years at issue was to breed * * * [his horse] to as many suitable mares as possible".[39] We found that "[t]he bulk of petitioner's promotional efforts involved his personal solicitation of individuals to breed their mares" to his stallion.[40] Further, Mr. Tolin "believed he could overcome the difficulties inherent in attracting customers by heavily promoting" his horse and "stallion promotion was his primary focus during the years at issue."[41] We held that Mr. Tolin "was directly involved in the day-to-day management and operations of the thoroughbred activity; [and] therefore, any investor work he completed qualifies as participation for the purposes of section 469."[42]

Mr. Lamas worked in the day-to-day management and operations of Shoma because he was working to meet Shoma's need for capital for its projects, an essential part of Shoma's business during 2008. Like Mr. Tolin's, most of Mr. Lamas' work was promotion. Mr. Lamas' promotion went to the core goal for Shoma at the time, which was to find project investors. Accordingly, the investor

---

[39]Tolin v. Commissioner, at *11-*12.

[40]Tolin v. Commissioner, at *13.

[41]Tolin v. Commissioner, at *13.

[42]Tolin v. Commissioner, at *42-*43.

**[\*40]** exception does not apply, and all of Mr. Lamas' work for Shoma, including investor activity, qualifies as participation.

C.  The Work Not Customarily Done by Owners Exception Does Not Apply.

The regulations also do not count a taxpayer's participation in a trade or business if the taxpayer does work that is not customarily done by an owner and "[o]ne of the principal purposes for the performance of such work is to avoid the disallowance * * * of any loss or credit from such activity."[43]

The regulations illustrate how this exception operates in an example involving a married couple who file separate income tax returns.[44] The husband is a full-time attorney who also owns an interest in a professional football team. He anticipates that he will have a loss from the football team for the year, but in order to prevent the disallowance of this loss under section 469, he pays his wife to be a receptionist for the football team for 15 hours per week. He then counts her hours toward his participation on his tax return because spouses can aggregate their participation under section 1.469-5T(f)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). Because owners do not customarily work as

---

[43]Sec. 1.469-5T(f)(2)(i), Temporary Income Tax Regs., supra.

[44]Sec. 1.469-5T(k), Example (7), Temporary Income Tax Regs., 53 Fed. Reg. 5728 (Feb. 25, 1988).

[*41] receptionists, and because one of the husband's primary purposes for paying his wife as a receptionist was to avoid the disallowance of his passive losses, the avoidance exception applies and the husband is not treated as participating in the activity.

We find Mr. Lamas participated in work customarily done by owners, and he did not do this work with a purpose of avoiding the section 469 loss limitations. Mr. Lamas worked restoring Shoma assets and opportunities and finding potential investors for Shoma projects. In contrast to the example in the regulations, these activities are customarily done by owners. Further, Mr. Lamas' purpose was to protect his investment in Shoma by helping Shoma to survive. Accordingly, the avoidance exception does not apply.

V.  Whether, alternatively, Mr. Lamas Materially Participated in Significant Participation Activities for More Than 500 Hours Under Section 1.469-5T(a)(4), Temporary Income Tax Regs.

Even if Mr. Lamas worked fewer than 691 hours for Shoma and Greens during 2008, he would still qualify as materially participating under section 1.469-5T(a)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), by having significant participation activities that exceed 500 hours in the aggregate for 2008.

**[\*42]** A significant participation activity is a trade or business activity that the taxpayer participates in for more than 100 hours during the taxable year, and an activity that the taxpayer would otherwise not be treated as materially participating in under the other tests.[45]  To satisfy this material participation test, taxpayers must aggregate all their significant participation activities together for the taxable year, and this total must exceed 500 hours.[46]

The regulations provide an example to illustrate aggregation of significant participation activities.[47]  In this example, the taxpayer works fulltime as an accountant and also owns an interest in a shoe store and a restaurant.  Both the shoe store and the restaurant qualify as separate trade or business activities.  The taxpayer works for 400 hours for the restaurant and 150 hours for the shoe store during the taxable year.  Both the shoe store and the restaurant additionally qualify as significant participation activities under section 1.469-5T(c), Temporary

---

[45]Estate of Strangeland v. Commissioner, T.C. Memo. 2010-185, 2010 WL 3239181 at \*11; sec. 1.469-5T(c), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

[46]Sec. 1.469-5T(a)(4), Temporary Income Tax Regs., supra.

[47]Sec. 1.469-5T(k), Example (4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

[*43] Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988) and the taxpayer's aggregate significant participation activities for the year is 550 hours. Accordingly, the regulations conclude that the taxpayer satisfies the material participation test under section 1.469-5T(a)(4), Temporary Income Tax Regs., supra.

Similar to this example, we find that Mr. Lamas' work for Bella Vista, and Shoma and Greens qualifies as significant participation activities that exceeded 500 hours in the aggregate for 2008.[48]

Bella Vista qualifies as a significant participation activity with which Mr. Lamas worked at least 294 hours during 2008. Mr. Lamas negotiated new bank financing, supervised subcontractors, managed tenants, and generated financial reports for the project. Even if some of these hours were spent in his capacity as an investor, Mr. Lamas was involved in the day-to-day management and operations of Bella Vista; and therefore the investor exception does not apply. Further, we find that the avoidance exception does not apply because the work he

---

[48]Although the Lamases argue that Mr. Lamas worked for more than 100 hours on the Gables project in 2008, their estimates for Mr. Lamas' site visits were too high; consequently his total participation in Gables was less than 100 hours. Accordingly, we conclude that Gables was not a significant participation activity.

We further find that Bella Vista and Shoma/Greens qualify as two separate trade or business activities.

[*44] performed was the kind of work performed by owners and he did not engage in that work with a principal purpose of avoiding the section 469 loss limitations. Because Mr. Lamas' participation in Bella Vista is greater than 100 hours, and his Bella Vista work would not otherwise qualify under the other tests as material participation, we find that the Lamases met their burden to show that Bella Vista is a significant participation activity.

Even if one were to quibble with our finding that Mr. Lamas worked at least 691 hours for Shoma and Greens and would deduct an odd hour here or there such that the number of hours would drop below 500, Shoma and Greens would then qualify as a significant participation activity that could be aggregated with Bella Vista, which we found to have at least 294 hours. Under that scenario, Mr. Lamas' significant participation activities, Bella Vista, and Shoma and Greens, exceed 500 hours.

VI.    No Adverse Inference

Respondent argues that we should draw an adverse inference against Mr. Lamas because he neither appeared at trial nor testified. We disagree. Mrs. Lamas explained that Mr. Lamas' absence at trial was due to health problems. But more importantly, Mr. Lamas' material participation is amply supported by both

**[\*45]** documentary evidence and testimony. This independent evidence outweighs any adverse inference that might be drawn against Mr. Lamas.

VII. <u>Conclusion</u>

Mr. Lamas materially participated in Shoma and Greens for 2008, and therefore the passive loss limitation of section 469 does not apply to the losses the Lamases incurred for that year. We have considered the parties' arguments and, to the extent not addressed, we find them to be irrelevant, moot, or without merit.

To reflect the foregoing and the deemed concessions of the Lamases,

<u>Decision will be entered under</u>

<u>Rule 155</u>.